STATE OF NORTH CAROLINA v. ODELL C. CAWTHORNE

No. 5

(Filed 1 September 1976)

1. Homicide § 21— murder in perpetration of robbery of cab driver — sufficiency of evidence

In a prosecution for murder committed in the perpetration of an armed robbery, evidence was sufficient to be submitted to the jury where it tended to show that deceased picked up defendant and his companion in deceased's cab, halfway to his destination defendant decided to rob deceased cab driver, and in the process of executing the robbery with a .32 caliber revolver defendant shot and killed the driver; that defendant may not have intended to discharge the gun he was holding at the cab driver's head when he took his money was totally irrelevant.

2. Criminal Law § 75; Homicide § 20— confession — pistol — admissibility

The trial court did not err in allowing into evidence a confession made by defendant and a pistol found in defendant's house where the evidence on *voir dire* fully justified the court's findings that police officers observed all the procedural safeguards in conducting the interrogations which preceded defendant's consent to the search of his premises and his confession.

3. **Criminal Law § 73; Homicide § 15— murder of cab driver — statement by driver — testimony by dispatcher admissible**

   In a prosecution of defendant for the first degree murder of a cab driver, the trial court did not err in allowing the cab dispatcher to testify concerning information as to destination and number of passengers given her by the deceased cab driver during the time defendant and his companion were being transported in his cab, since the radio transmission testified to by the dispatcher was made in the regular course of business, and the statement made by deceased cab driver was properly admitted under the *res gestae* concept and under the exception to the hearsay rule enunciated in *S. v. Vestal*, 278 N.C. 561.

4. **Criminal Law § 116— failure of defendant to testify — jury instruction proper**

   The trial court's instruction on defendant's failure to testify, although not in the traditional language, made it clear that defendant had the right to testify or to refrain from testifying as he saw fit, and that his failure to testify created no presumption against him; however, since defendant requested no such instruction, it would have been better for the judge to make no reference to defendant's failure to testify.

5. **Criminal Law § 163— objections to jury charge — time for making**

   Objections to the charge in reviewing the evidence and stating the contentions of the parties must be made before the jury retires to afford the trial judge an opportunity for correction; otherwise they are deemed to have been waived and will not be considered on appeal.

6. **Constitutional Law § 36; Homicide § 31— first degree murder — death sentence vacated — life sentence substituted**

   Sentence of death imposed upon defendant in a first degree murder prosecution is vacated and sentence of life imprisonment is substituted therefor.

APPEAL by defendant under G.S. 7A-27 (a) from *Judge Perry Martin* at the 24 February 1975 Session, Superior Court of ONSLOW. *Certiorari* granted 14 November 1975.

Defendant was tried upon an indictment, drawn under G.S. 15-144, which charged him with the murder of Gordon Earl Peer (Peer) on 5 December 1974. From his conviction of murder in the first degree (felony murder), and the sentence of death imposed upon the verdict, he appealed to this Court.

The evidence for the State tended to show the following facts:

On the night of 4 December 1974 Peer had been working for about 18 months as a taxi driver for the Yellow Cab Com-

pany in Jacksonville. On that night he was driving cab No. 85. At 1:52 a.m. on 5 December 1974 the Yellow Cab dispatcher, Phyliss Barnard, directed Peer by radio to go to the Red Carpet Inn. A short time thereafter he reported to her "who he had picked up." He also said, "Red Carpet to Richlands." She then inquired whether he meant the Town of Richlands or Richlands Avenue in Jacksonville, which is just off Highway No. 17 North. He told her it was the latter, and Miss Barnard noted this information and the amount of the fare ($3.75) on a "manifest card." Company rules required her to record on a card where a driver "is picking up and where he is going." At that time the card is put through a time clock and again when he discharges. The driver is also required to fill out a manifest card.

A few minutes after Peer had reported he was going to No. 17 North the dispatcher received a call for a cab at an address on No. 17 North, and she at once attempted to communicate with Peer. He was a driver who always answered "almost immediately"; so, when Miss Barnard's repeated efforts to contact him by radio were unsuccessful, she alerted the other drivers to look out for him and instructed cab driver Ernest S. Humphrey to "start checking 17 North, Richlands Avenue." She also called the Sheriff's Department, the Air Station PMO, Camp Geiger PMO, and Camp Lejeune Maingate.

Between 2:30 and 2:33 a.m., from Highway No. 17, Humphrey spotted Peer's cab stopped at 202 Roosevelt Road in the middle of the street. Its motor was running; all the lights were off except the blue top light. When he went up to the cab he found Peer "slumped down" on the driver's side in the front seat. There was blood all over his chest and he appeared to be unconscious. Humphrey immediately called the dispatcher and told her to send an ambulance. About 3:00 a.m. the rescue squad and C. D. Sisk, a detective with the Jacksonville Police Department, and several other police officers arrived at the scene.

When the rescue squad arrived Peer's body was still warm, but there were no vital signs. He was transported to the Onslow Memorial Hospital. There the doctor on duty pronounced him dead on arrival and sent his body to the morgue.

At 8:50 a.m. on 5 December 1974 Dr. Walter D. Gable, an expert in pathology, examined Peer's body in the morgue. He

testified that the cause of Peer's death was a gunshot wound in the right temple. There were powder burns around it, but it was "a close type wound"—not a contact wound. The bullet had fractured the skull and caused massive lacerations in the brain. Dr. Gable removed the bullet (Exhibit 5) and turned it over to Detective Brown of the Jacksonville Police Department, who immediately delivered it to SBI Agent Woodall.

At some time on 5 December 1974 defendant and one Charles Cook were arrested in connection with the murder by Jacksonville police. Detective Brown first saw and talked to defendant about 4:20 a.m. on December 6th at the Onslow County Jail. Brown testified that after identifying himself to defendant, he told him what he wanted to talk to him about.

Upon defendant's objection to the admission in evidence of any statement made by defendant to the investigating officers, the court conducted a *voir dire* to determine their admissibility. In the absence of the jury, Brown gave the testimony which is quoted and summarized below.

Before asking defendant any questions, Brown explained to him his constitutional rights and gave him the *Miranda* warnings in strict compliance with the requirements laid down in *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966). Having done so, Brown asked defendant if he understood what he had just told him. Defendant said he did, and he made the statement that he did not think a lawyer was necessary; that he did not want one. At that time the officers had in their possession a statement from Charles Cook that defendant was the person who had shot the cab driver. Cook had made his statement about 3:00 a.m. Brown did not inform defendant of Cook's statement because he had told Cook he would not tell him.

At the time Brown talked with him defendant did not appear to be under the influence of alcohol, narcotics, or anything else. Indeed, Brown was certain that defendant's statements to him were made freely, understandingly and voluntarily. "I made sure of that. . . . I indicated to him two or three times that I didn't want him to tell me anything without thinking of the lawyer part . . . that I didn't want him to answer my questions without a lawyer if he felt like he needed one. He told me again that he didn't see it necessary to have a lawyer. . . . I told him that I wanted to ask him one question, that

State v. Cawthorne

is where the gun was at. And after I got through asking him that, I said, 'If you don't want to answer, you ain't got to answer. If you want to wait until you get your lawyer, you can wait and see him.' He said, 'No, I'll tell you where it's at.' . . . He told me it was inside the house, he's got a chimney. . . . [T]he chimney is built on the side of the wall and the flue goes into the chimney and he said it was back in the bottom of the chimney. . . . [H]e pushed it and it fell down. I asked him for permission to go out to his house to get this gun. Mr. Cawthorne was cooperative and he said he would give me permission to go out there and get it, and I asked him if he would give it to me and Detective Sisk too and he said he would. So . . . he told Detective Sisk where it was at and then he signed his name at the top and also at the bottom" of the following "permission sheet" (State's *voir dire* Exhibit 1): "I, Odell C. Cawthorne, give Detective Ed Brown and Detective C. D. Sisk permission to get a pistol out of my house at 313 Richlands Avenue, Jacksonville, on 12-6-74, 4:25 a.m."

After he had signed the permission sheet defendant said to Brown, "If you will come back tomorrow, I'm kind of sleepy today, but if you will come back tomorrow, I'll give you a written statement on what happened." Brown said he "didn't go down there to get a statement," and he was surprised by defendant's offer.

About 1:00 p.m. on December 6th Brown went back to the jail and talked to defendant a second time. He again warned defendant—just as he had done earlier—of all his constitutional rights, and he once more inquired if defendant wanted a lawyer present. Again defendant said he would talk to Brown without a lawyer. He then read and signed a waiver (Exhibit 8), the second paragraph of which is set out below:

"I have read the statement of my rights [Miranda warnings] as shown above. I thoroughly understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer. I thoroughly understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me."

As recounted by Brown, defendant then made the following statement to him: "He told me that himself and Cook were out to the Red Carpet Inn and that they caught a cab and he said it was about two o'clock in the morning. That on the way from

the Red Carpet Inn to Richlands Avenue, he decided to rob the cab driver. He had the cab driver pull off on Roosevelt Road, which is the road before you get to Richlands Avenue, and he said he drove down about halfway and had him to pull over. He said he pulled out a gun, stuck it to the cab driver's head and told him he wanted his money and he said that he pulled the hammer back on the gun to make the cab driver think he was serious and he said when he got the money, started to get out of the car, the gun went off and he said he didn't intend to shoot the cab driver . . . but when he started to get out of the car, the gun went off and he didn't know what happened. He just got scared and ran . . . to his house at 313 Richlands Avenue. He told me that Cook was not involved in it . . . didn't know nothing about it and he indicated that, at two different times, that Cook was no part of it."

After he had completed his oral statement Brown asked defendant if he "would write it out" just like it happened, and defendant "printed it out in his own handwriting." He put his name and social security number at the top and, at the end, he signed his name to it. This statement, introduced in evidence as State's Exhibit 7, is as follows:

"On the 5th day of December 1974, myself and Charles Cook caught a cab from the Red Carpet Inn and on the way home I decided to rob the cab driver. Charles Cook had no knowledge of what was going to take place at all, even I didn't know until I got halfway home. I had been drinking a lot that night and when I put the gun up to the driver's head, I pulled the handle back to make him think I was serious. I didn't pull the trigger but when I went to get out of the cab I let go of the handle to get away and that was when the gun went off. We both were shocked because I was not going to shoot no one intentionally but it happened so we both ran home. Quote: Charles Cook had nothing to do with it whatsoever. Odell C. Cawthorne."

When Brown took defendant back to the cell he said to him, "I would like to ask you one more question. How much money was taken." Defendant replied, "Twenty or twenty-five dollars." In answer to Brown's inquiry if he knew what happened to it, defendant said he did not know; that he didn't get any of it.

In concluding his *voir dire* testimony Brown said on cross-examination that the statement which Cook had given the officers "consisted of practically the same thing" that defendant had told them; that every time the officers talked to him defendant kept repeating that Cook had nothing to do with it. Brown also said defendant "was more than cooperative with him and that, in his opinion, defendant had been honest with him throughout the whole investigation."

Defendant neither testified nor offered any evidence on the *voir dire*. The court made detailed findings of fact in accordance with the testimony of Detective Brown. On the facts found he concluded as a matter of law that defendant, after being fully advised of his constitutional rights as contained in the *Miranda* warnings, had understandingly and voluntarily waived these rights, including the presence of an attorney at his interrogation; that thereafter defendant told Brown where to find the gun and subsequently made both oral and written statements with reference to the events surrounding the death of Peer; that all his statements to the police were "made understandingly, voluntarily, knowingly and under no promise, threat or any form of coercion." Whereupon he overruled defendant's objection to the admission in evidence of his statements to Detective Brown.

Before the jury Brown gave substantially the same testimony he had given before the judge on *voir dire*. His testimony before the jury, however, tended to show these additional facts: (1) The distance from 202 Rooseevelt Road, where Humphrey had found the abandoned cab, to defendant's residence at 313 Richlands Avenue was a little less than two-tenths of a mile by way of a driveway between the two streets. (2) After leaving the jail at about 4:30 a.m. on December 6th, Detectives Brown and Sisk procured a magnet and proceeded to 313 Richlands Avenue. There they disconnected the oil heater from the chimney and, using the magnet, they pulled up the .32 nickle plated pistol, which was introduced in evidence as Exhibit 6.

Alma Jones, who, in December 1974, resided with her boyfriend, Charles Cook, in defendant's home at 313 Richlands Avenue, gave tesetimony which is summarized as follows:

About 6:30 p.m. on 4 December 1974 Alma Jones, leaving Cook at the house, walked to her work as a barmaid "up town." At 2:00 a.m. (December 5th) she returned home with three

men. When she arrived neither defendant nor Cook was there, but within three minutes both came in. At defendant's request she "stepped into his bedroom" so that he could speak to her privately. He gave her a roll of dollar bills and told her "he had robbed some swine" and "had shot someone." He did not tell her whom he had robbed or shot, and she did not believe he would shoot anyone. He showed her a loaded .32-caliber pistol (Exhibit 6) from which she could see that a bullet had been fired. Cook, who seemed upset, also came into the room. However, when she tried to find out from him what had happened he wouldn't discuss it. She had seen Cook and defendant earlier that night, between 10:00 and 10:30 p.m., when they entered the place where she worked. Thereafter she did not see them again until they came home shortly after 2:00 a.m.

Mrs. Jones had seen the .32-caliber pistol, a silver or nickle plated revolver with the letters S & W on it, two days earlier when defendant showed it to her and Cook. At that time the gun was loaded and, fearing it would get defendant into trouble, she had taken the gun from him and hidden it. Thereafter defendant "got high on some wine" and demanded the gun; so she had to give it back to him.

Mrs. Jones first saw Detective Brown when he came to the house to search for the gun. She saw the officers retrieve the gun; it was Exhibit 6, the same gun she had seen two days earlier.

SBI Agent Woodall talked to Mrs. Jones at the Jacksonville Police Department on December 6th approximately 24 hours after "the alleged murder." She had been "picked up" because she was residing at 313 Richlands Avenue where defendant and Cook resided. Woodall testified she had then "stated basically" what she stated in court, except that she did not mention she had seen defendant with the gun on the morning of December 5th. Woodall also testified that Mrs. Jones told him she did not know how much money defendant had handed her in his bedroom between 2:15 and 2:30 a.m. December 5th; that she had returned it to him during their conversation; that she estimated the roll to contain between seven and ten dollars in one dollar bills; that when she got up on the morning of December 5th defendant was already gone; and that sometime during the early morning defendant had gone to the attic.

SBI Agent Frank Satterfield, a firearms identification expert to whom the bullet (Exhibit 5) and the .32-caliber S & W revolver (Exhibit 6) had been delivered, testified in substance as follows: The bullet was so mutilated and distorted that, although he fired about five "test rounds" from Exhibit 6, "a cheap revolver," he could not determine conclusively whether it had fired Exhibit 5. Satterfield did, however, note a number of similar characteristics between the test-fired rounds and the bullet.

Defendant rested without offering any evidence and moved for a judgment as of nonsuit. The motion was denied. After hearing the argument of counsel and the court's instructions, the jury found defendant guilty as charged.

*Attorney General Rufus L. Edmisten; Assistant Attorney General George W. Boylan for the State.*

*Grady Mercer, Jr., for defendant appellant.*

SHARP, Chief Justice.

Defendant's assignments of error numbered two through six assert that the trial judge erred (1) in overruling his motion for judgment as of nonsuit at the close of all the evidence; and (2) in making the findings of fact and conclusions of law upon which he admitted in evidence (a) defendant's confession that he shot the cab driver and (b) State's Exhibit C, the pistol which the officers retrieved from the chimney in defendant's home.

In lieu of stating his contentions in support of the foregoing assignments as required by App. R. 28(b)(3), defendant has "respectfully requested" that the Court (1) examine the evidence on *voir dire* to determine if it supports the judge's findings of fact and conclusions of law that "the purported confession was admissible as evidence against defendant," and (2) determine if there was sufficient evidence to withstand defendant's motion for nonsuit. The detailed preliminary statement of the evidence in this case manifests our careful examination of the record. It further reveals that any attempt by defendant to comply with App. R. 28(b)(3) would have been futile. The record contains no basis for any argument in support of assignments two through six.

[1] The uncontradicted evidence of the State, which included defendant's full confession, establishes beyond any reasonable

doubt that he shot and killed Peer in the course of an armed robbery. That defendant may not have intended to discharge the gun he was holding at the cab driver's head when he took his money is totally irrelevant. *State v. Shrader,* 290 N.C. 253, 225 S.E. 2d 522 (1976); *State v. Thompson,* 280 N.C. 202, 185 S.E. 2d 666 (1972). Defendant stands convicted by his own voluntary confession. It is to his credit that he neither attempted to repudiate nor to invalidate his statement admitting the facts which establish his guilt and absolve his companion Cook of any complicity in Peer's murder. Patently, the trial court was correct in overruling the motion for nonsuit. *State v. McKinney,* 288 N.C. 113, 215 S.E. 2d 578 (1975).

[2] Nor did the trial judge err in his rulings upon the admission of evidence. The State's evidence on *voir dire,* uncontradicted by testimony from defendant himself or any other person, fully justified the court's findings that the police officers observed all the procedural safeguards in conducting the interrogations which preceded defendant's consent to the search of his premises and his confession. Defendant's objections to the admission of his confession and the pistol, which was the fruit of the search he voluntarily authorized, were properly overruled. *State v. Moore,* 284 N.C. 485, 202 S.E. 2d 169 (1974). *See State v. Williams,* 274 N.C. 328, 163 S.E. 2d 353 (1968).

[3] Defendant's assignment No. 1 is that the court committed prejudicial error in permitting Miss Barnard, the Yellow Cab dispatcher, to testify that after she had directed Peer to go to the Red Carpet Inn he "called in his number," told her "who he had picked up," and that he was taking his passengers to Richlands Avenue just off Highway No. 17. We interpret Miss Barnard's testimony to mean that Peer told her he had "two fares" for Richlands Avenue just off No. 17. Nothing in the record suggests that he either knew or gave the dispatcher the names of his passengers. As dispatcher for the Cab Company, Miss Barnard was interested in knowing, and recording, only the number of the cabby's passengers and the distance he would transport them so that she could determine the fare for which the driver should account. The rules of Cab Company required Peer to give the dispatcher this information. Thus, his radio transmission to her was made in the regular course of business and during the trip involved here. The reasonable probability of its truthfulness is obvious.

Peer's challenged statement to the dispatcher was properly admitted under "the *res gestae* concept" and also under the exception to the hearsay rule enunciated in *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755, *cert. denied* 414 U.S. 874 (1971). In *Vestal* a murder victim's declarations to his wife that he was going with the defendant on a business trip to Delaware, made while he was preparing to leave home, were held admissible to show his intention to leave town with the defendant. *See* 1 Stansbury, North Carolina Evidence § 162 (Brandis Rev. 1973). It is perfectly clear, however, that the admission of the radio transmission, even had it been erroneous, could not have been prejudicial error, for Peer's taxi and body were found in a driveway off Richlands Avenue less than two-tenths of a mile from defendant's residence. Further, substantially the same testimony was elicited from another witness without objection.

[4] Defendant's seventh assignment of error relates to the court's instructions on defendant's failure to testify. This instruction, although not in the traditional language, made it clear that defendant had the right to testify or to refrain from testifying as he saw fit, and that his failure to testify created no presumption against him. In this instruction we can perceive no prejudice to defendant. *State v. Sanders*, 288 N.C. 285, 218 S.E. 2d 352 (1975). However, since defendant requested no such instruction, we are constrained to repeat once more that, in the absence of a request, it is better for the judge to make no reference to defendant's failure to testify. *State v. Baxter*, 285 N.C. 735, 208 S.E. 2d 696 (1974); *State v. Bryant*, 283 N.C. 227, 195 S.E. 2d 509 (1973).

[5] Defendant's eighth assignment asserts that in reviewing certain evidence the judge misinterpreted it. We find no merit in this contention. We also note "[t]he general rule . . . is that objections to the charge in reviewing the evidence and stating the contentions of the parties must be made before the jury retires to afford the trial judge an opportunity for correction; otherwise they are deemed to have been waived and will not be considered on appeal." *State v. Thomas*, 284 N.C. 212, 218, 200 S.E. 2d 3, 8 (1973).

In defendant's trial we find no error which, in our view, could have possibly influenced the verdict.

[6] Defendant's final assignment is that the judge erred in denying his motion in arrest of the judgment imposing upon

him the sentence of death. After we had heard the arguments in this case the Supreme Court of the United States, in *Woodson v. North Carolina*, _____ U.S. _____, 96 S.Ct. 2978, 44 L.W. 5267 (1976), invalidated the death penalty provision of G.S. 14-17 (Cum. Supp. 1975), the statute under which defendant was convicted of first degree murder and sentenced to death. We must, therefore, vacate the sentence of death imposed upon defendant and, under the authority of N. C. Sess. Laws, ch. 1201, § 7 (Session of 1974), substitute the sentence of life imprisonment.

Accordingly, it is hereby ordered that, upon remand of this cause to the Superior Court of Onslow County, the presiding judge, without requiring the presence of defendant, shall enter a judgment of life imprisonment in lieu of the sentence of death heretofore imposed upon him for the first degree murder of which he has been convicted. Further, in accordance with this judgment, the clerk of the superior court will issue a new commitment in substitution for the commitment heretofore issued. At the same time the clerk will furnish to defendant and his attorney a copy of the judgment and commitment as revised in accordance with this opinion.

In the trial, insofar as it affects the verdict, we find

No error.

As to the judgment imposed upon the verdict, the death sentence is vacated and, in lieu thereof, a sentence of life imprisonment is substituted.