STATE OF NORTH CAROLINA v. JIMMY DEVOE McELRATH

No. 7A87

(Filed 6 April 1988)

**1. Homicide § 21.5— first degree murder—evidence entirely circumstantial—sufficient**

The State's trial evidence identifying defendant as the person who committed the victim's murder, albeit circumstantial in nature, was sufficiently substantial to warrant sending the case to the jury where the victim had recently separated from defendant's daughter and divorce was imminent; defendant met the victim at a restaurant in Georgia on the morning of 23 December 1984; the victim telephoned his next-door neighbor on that same morning and left a message for his roommate that he was traveling to North Carolina with defendant; defendant traveled to North Carolina on 23 December, stayed overnight at his summer home, and departed for Georgia late in the afternoon on the following day; the victim's body was located on 26 December nine and a half miles from defendant's home; testing by law enforcement officers yielded positive reactions for the presence of blood at numerous sites in defendant's home and automobile; metal shavings attached to newly-drilled holes in the trunk of defendant's automobile tested positive for blood; rope found at the scene and green paint found on the rope were similar to rope and paint found at defendant's house; and shotgun wadding and pellets removed from the victim's body were consistent with ammunition discovered at defendant's house.

**2. Criminal Law § 35— murder—evidence that crime committed by another—erroneously excluded**

The trial court erred in a prosecution for first degree murder by excluding a drawing found by law enforcement officers among the victim's personal effects which included a rough map of the area surrounding defendant's North Carolina home and numerous written notations indicating a possible larceny scheme. The exhibit was relevant to the crucial issue of whether defendant was in fact the true perpetrator of the crime in that the exhibit,

1

State v. McElrath

together with additional evidence of the victim's argument with and ultimate departure with persons other than defendant from a restaurant on the day of his disappearance, would constitute a possible alternative explanation for the victim's unfortunate demise. There was prejudice because this was a very close case in which there was only circumstantial evidence identifying this defendant to the exclusion of other persons as the perpetrator.

**3. Criminal Law § 73.2— hearsay—intent to engage in future act—admissible**
The trial court did not err in a first degree murder prosecution by admitting into evidence a telephone message written by the victim's next-door neighbor to the victim's roommate where the message constituted a statement by the victim of his then existing intent to do an act in the future. N.C.G.S. § 8C-1, Rule 803(3).

Justice MITCHELL dissenting.

Justices MARTIN and FRYE join in this dissenting opinion.

APPEAL as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Allen, J.,* at the 11 August 1986 Criminal Session of Superior Court, HAYWOOD County, upon defendant's conviction by a jury of first-degree murder. Heard in the Supreme Court on 9 December 1987.

*Lacy H. Thornburg, Attorney General, by John H. Watters, Assistant Attorney General, for the State.*

*Smith, Bonfoey & Queen, by Frank G. Queen, Burton C. Smith, Jr., and Constance C. Moore, for defendant-appellant.*

MEYER, Justice.

Defendant was convicted of the first-degree murder of his son-in-law, Steven Wade Boyer. The State having stipulated before trial to the absence of any statutory aggravating factors under N.C.G.S. § 15A-2000, the case was tried as a noncapital case, and defendant was accordingly sentenced to the mandatory life term. In his appeal to this Court, defendant brings forward numerous assignments of error relative to the guilt-innocence phase of his trial. We have reviewed the entire record, and because we find that the trial court committed prejudicial error in refusing to admit certain relevant and potentially exculpatory evidence offered by defendant, we hold that defendant is entitled to a new trial.

The facts and circumstances surrounding the mysterious disappearance and death of Steven Wade Boyer are amongst the most bizarre and unusual in the annals of crime in this state. On 26 December 1984, a nude, headless, and handless body was discovered along the side of Highway 276 in rural Transylvania County, North Carolina. The body was later identified, and it was stipulated at the trial to be that of the victim, Steven Wade Boyer. The cause of death, as revealed by the subsequent autopsy, was a shotgun wound to the victim's lower left chest. Boyer's head and hands were apparently severed from his body by the perpetrator after the victim had died and have never been found.

The State's case against defendant Jimmy Devoe McElrath is based entirely upon circumstantial evidence amassed by various law enforcement officers during a lengthy investigation. The State's evidence tended to show that, at the time of the victim's death, defendant, who grew up in Haywood County, North Carolina, was retired from General Motors Corporation, for which he had been a dealer consultant in the southeastern United States for some twenty years. Defendant and his wife, Nancy, owned two homes—a summer home in Cruso, Haywood County, North Carolina, and a winter home in Islamorada, Monroe County, Florida.

The victim was married to defendant's daughter, Ellen. At the time of the events in question, however, the victim and defendant's daughter were living apart from one another in separate apartments in Smyrna, Georgia, and a divorce was apparently imminent. It was in this context that defendant and his wife traveled from their Florida home to their daughter's apartment in Smyrna to spend the Christmas holidays.

Defendant and his wife, Nancy McElrath, arrived at their daughter's home late on the evening of 21 December 1984. On the following day, 22 December, defendant went to visit the victim at his apartment in Smyrna. Though the victim was not at home at the time of defendant's initial visit, defendant returned later that evening and spoke to the victim on that occasion. During the course of this second visit, defendant and the victim apparently agreed to meet at 10:30 a.m. the following morning at a nearby Denny's Restaurant in Smyrna.

On 23 December, the day defendant and the victim met at Denny's, the victim disappeared. Jim Baumgarten, the victim's

roommate, testified that he last saw the victim at about 9:40 a.m. Baumgarten testified further that upon getting out of the shower some time later, he found a note on his kitchen window which had been written by his next-door neighbor, Sherri Elliott. That note, which was introduced into evidence by the State, read as follows: "Jim, Steve called and said that he was riding to Waynesville[,] North Carolina with his father-in-law. Sherri." Later that day, Sherri explained to Baumgarten that the victim had called her to say that he could not reach Jim and that he wanted to leave a message.

On 26 December 1984, the victim's nude, headless, and handless body was discovered alongside Highway 276 in rural Transylvania County, 9.5 miles away from defendant's nearby summer home in Haywood County. The body was very clean, as if it had been washed, and contained a strikingly small amount of blood. The body bore multiple marks which seemed to indicate that it had been tightly wrapped or bound. In addition to the principal chest wound caused by the shotgun blast and the wounds caused by the amputations, there were numerous scratches on the surface of the body. Some of the scratches appeared on the chest, and many more were present on the back in the upper shoulder area, as if the victim had been pulled by the legs over a rough surface. Also found at the scene were blood spots on the pavement near the side of the road and a two- to three-foot piece of white rope which bore a green stain.

Clyde Kelly is defendant's long-time friend and neighbor, and he lives directly across Pisgah Creek from defendant's summer home in Haywood County. Kelly testified that it is very unusual for the McElraths to come to Haywood County during the winter. According to Kelly, defendant and his wife would generally leave their North Carolina home for Florida in October, not to return until the following April. Kelly testified further that he had never known defendant to come to the North Carolina home without his wife. During the winter months, the home is winterized, with the only electrical power left connected being that to the refrigerator.

On 23 December 1984, Clyde Kelly left his house at about 4:00 p.m. and noticed that the gate to the McElrath home, usually left locked during the winter months, was open. Defendant's black Pontiac automobile was parked next to the house, the blinds to

the house were down, and there were no lights on. When Kelly returned to his home between 9:00 p.m. and 10:00 p.m. that night, he noticed that some lights, including the outside light over defendant's garage, were on. Kelly did not go to defendant's house on that occasion.

The following day, 24 December, at approximately 1:00 p.m., Clyde Kelly noticed that both of defendant's automobiles, the black Pontiac and a brown Pontiac, were parked outside the garage at defendant's house. Kelly then went over for a visit and found defendant in his driveway switching tires from one car to the other. Defendant told Kelly that he and his wife had driven from Florida to Smyrna, Georgia, to visit their daughter Ellen for Christmas because she was depressed about the breakup of her marriage to the victim. Defendant told Kelly further that he had driven to Haywood County from Smyrna in order to visit his father who had recently had an accident. While with defendant in the driveway, Kelly noticed that the trunks of both automobiles were open and empty. Later, while talking to defendant inside the home, Kelly noticed that Nancy McElrath did not seem to be present, but saw nothing else that seemed unusual. Kelly continued talking to defendant until about 4:15 p.m. that afternoon when he returned to his own home.

Arthur Huber, who is a friend and off-and-on business partner of defendant, owns the grocery store in Cruso, Haywood County, North Carolina. At around 11:00 a.m. on 24 December, defendant visited Huber at his store. While at Huber's store, defendant borrowed Huber's 3/8" drill, saying he needed it to work on a dishwasher at his home. Huber testified that there was a drill bit in the drill when he loaned it to defendant. The drill bit was not in the drill when defendant subsequently returned it. As a part of the lengthy investigation of the case, police officers did a very thorough search of defendant's brown Pontiac automobile. Among other things, they found multiple drill holes in the trunk, including the fender wells, all of which had a shiny appearance.

Various law enforcement officers testified at trial to the results of an exhaustive investigation of the Haywood County home. Officers found rope at defendant's home which was similar to the rope found near the victim's body. They also found green paint which could have been the same paint that caused the green

stain on the rope in question. Numerous knives and two shotguns were seized by officers from the home, but neither of the guns and none of the knives bore any trace of blood. The cases in which the shotguns were found were covered with dust and cobwebs and had apparently not been opened recently. However, shotgun pellets and wadding taken from the victim's body were nonetheless consistent with ammunition found at defendant's home.

Officers testified further about the testing of various sites in defendant's home for the presence of blood. For the purpose of these tests, a positive reaction to phenolphthalein or luminol creates a presumption that blood is present. Further testing is necessary to confirm that the substance is human blood and/or to determine the relevant blood type. The phenolphthalein reacted positively in the following areas: a curtain on the door between the garage and the kitchen, the garage floor under a garden hose and at a spot near the middle of the floor, and on the vanity in one of the bathrooms. The spot on the bathroom vanity was confirmed as blood through further testing. The minuscule amount of material involved at the other sites prevented further testing. Luminol testing, which is used to locate blood that is not visible, identified the presence of blood at additional sites in defendant's home, including the utility room and the sink and the floor in the bathroom.

Defendant's brown Pontiac automobile was subjected to an extensive investigation which included exhaustive testing for blood with phenolphthalein and luminol. Positive reactions to the chemicals, presumptively indicating the presence of blood, occurred at test sites in the trunk, in the fender well, near the license plate, between the front seats, and on two of the metal shavings attached to the newly drilled holes in the trunk. The matting under the rear seat was quite wet, and officers detected the odor of urine in the rear seat area.

Defendant presented evidence which tended to show that he never saw the victim again after their morning meeting at Denny's Restaurant on 23 December. According to defendant, while he and the victim were talking in the Denny's parking lot, another car approached. The victim walked over to the car and began to argue with one of its occupants. The victim returned to

defendant's car, told defendant that he would see him later, and departed in the other car. After the victim departed, defendant himself left and drove to his summer home in North Carolina.

Defendant testified that his principal reason for going to North Carolina on 23 December was to visit his father who had recently been injured in an accident. Patsy Clark Kelly, a life-long friend of defendant, testified that she saw and talked to defendant at The Pantry, a convenience store in Canton, North Carolina, between 3:00 p.m. and 3:30 p.m. on the afternoon of 23 December. She testified further that she stood with defendant as he put gas in his car and that, though she did not look directly into defendant's car, she did not see anyone with him. According to Ms. Kelly, defendant acted normally during their brief conversation.

Defendant also testified that, arising early on the morning of 24 December, he drove to his parents' home in nearby Canton, North Carolina, to visit with them over breakfast. While returning home later that morning, defendant stopped at the Cruso Grocery and borrowed a 3/8″ drill from the owner of the grocery, Arthur Huber. Defendant borrowed the drill in order to do some work on the dishwasher water pump at his home. More precisely, defendant needed the drill because he had recently lost the ring finger on his right hand in a boating accident and, as a result, needed the power tool to help him in removing screws from the pump. Using Arthur Huber's drill, defendant worked on the pump for approximately one and a half hours upon arriving home.

Defendant testified further that, after completing work on the dishwasher water pump, he switched a number of the tires on his two Pontiac automobiles. According to defendant, while talking with his friend and neighbor, Clyde Kelly, he switched the tires from his brown Pontiac to his black Pontiac because the tires on his black Pontiac had recently been punctured. Later, after Kelly had departed, defendant drained the water from the plumbing in the home and left for Smyrna, Georgia, in the black Pontiac at about 4:00 p.m.

Defendant spent the next few days with his daughter at her Smyrna, Georgia, apartment, and he and his wife returned to Florida on 28 December. As a result of a 3 January 1985 telephone call, defendant's wife became concerned about her daughter and decided to return to Smyrna to stay with her until

her divorce from the victim became final on 7 February. Defendant and his wife left on 4 January and, while traveling north, decided to go by the North Carolina home in order to pick up the brown Pontiac and some of defendant's wife's winter clothes. The McElraths arrived at their summer home at around 4:00 a.m. on 4 January. According to defendant, they slept until 12:00 noon the following day and departed shortly thereafter for their daughter's home in Smyrna.

On the basis of this and other evidence, the jury found defendant guilty of the first-degree murder of his son-in-law, Steven Wade Boyer. Because the matter was tried as a noncapital case, Judge Allen sentenced defendant to the mandatory life term. In his appeal to this Court, defendant brings forward numerous assignments of error, three of which we address below: first, that the trial court committed reversible error in failing to grant defendant's motions to dismiss on the grounds that the evidence was insufficient as a matter of law to take the case to the jury; second, that the trial court committed reversible error in refusing to admit into evidence a documentary exhibit which was relevant and potentially exculpatory; and third, and finally, that the trial court committed reversible error in admitting into evidence a written telephone message to defendant because the statement was inadmissible hearsay. We deal with each of these assignments of error in turn.

I.

[1]  In his first assignment of error, defendant asserts that the trial court committed reversible error in denying his motion to dismiss on the grounds that the evidence was insufficient as a matter of law. Specifically, defendant argues that Judge Allen's decision to submit to the jury the charge of first-degree murder was improper because there was not substantial evidence that this defendant was in fact the perpetrator of the crime. Although it is admittedly a close question, we do not agree, and we therefore overrule defendant's assignment of error.

As an initial matter, we note that defendant moved for a dismissal on two separate occasions—once at the conclusion of the State's evidence and a second time at the conclusion of all of the evidence. Because defendant introduced evidence at trial on his own behalf, he waived his right to complain on appeal of the

denial of his initial motion to dismiss at the conclusion of the State's evidence. *State v. Leonard,* 300 N.C. 223, 266 S.E. 2d 631, *cert. denied,* 449 U.S. 960, 66 L.Ed. 2d 227 (1980); N.C.G.S. § 15-173 (1983). Accordingly, only the sufficiency of the evidence at the close of all of the evidence is before us here.

This Court has previously addressed on numerous occasions the nature of the legal test for the sufficiency of the evidence in a criminal matter. In *State v. Johnson,* 199 N.C. 429, 154 S.E. 730 (1930), for example, Chief Justice Stacy wrote one of the classic statements of the sufficiency of the evidence test:

> It is sometimes difficult to distinguish between evidence sufficient to carry a case to the jury, and a mere scintilla, which only raises a suspicion or possibility of the fact in issue. The general rule is that, if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury.

*Id.* at 431, 154 S.E. at 731 (citations omitted).

More recently, in the case of *State v. Bullard,* 312 N.C. 129, 322 S.E. 2d 370 (1984), we described the test in greater detail:

> When a defendant moves for dismissal, the trial court must determine whether there is substantial evidence of each essential element of the offense charged (or of a lesser offense included therein), and of the defendant being the one who committed the crime. If that evidence is present, the motion to dismiss is properly denied. *State v. Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649 (1982); *State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith,* 300 N.C. 71, 78-79, 265 S.E. 2d 164, 169 (1980) (citation omitted).

> In ruling on a motion to dismiss, the evidence must be considered by the court in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn from the evidence. *State v. Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649. Contradictions and discrepancies must be

resolved in favor of the State, and the defendant's evidence, unless favorable to the State, is not to be taken into consideration. *Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649; *State v. Jones,* 280 N.C. 60, 184 S.E. 2d 862 (1971). The test of the sufficiency of the evidence on a motion to dismiss is the same whether the evidence is direct, circumstantial, or both. *State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114. All evidence actually admitted, both competent and incompetent, which is favorable to the State must be considered. *State v. McKinney,* 288 N.C. 113, 215 S.E. 2d 578 (1975).

*Bullard,* 312 N.C. at 160, 322 S.E. 2d at 387-88.

Defendant's precise contention under this assignment of error is that the State failed to introduce substantial evidence at trial that defendant was in fact the person who committed the crime in question. The question before us is therefore whether, upon viewing all the evidence in the light most favorable to the State and upon granting the State every reasonable inference to be drawn from the evidence, *State v. Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649 (1982), a reasonable juror might accept the evidence as adequate to support the conclusion this defendant was in fact the perpetrator of this grisly crime, *State v. Smith,* 300 N.C. 71, 265 S.E. 2d 164 (1980). Defendant argues that the only correct answer to this question is "no." Though we regard this as a very close question, we believe that the correct answer is "yes," and we therefore overrule defendant's first assignment of error.

In our opinion, the State's trial evidence identifying defendant as the person who committed the victim's murder, albeit circumstantial in nature, was sufficiently substantial to warrant sending the case to the jury. The victim had recently separated from defendant's daughter, and a divorce was imminent. Defendant met the victim at a Denny's Restaurant in Smyrna, Georgia, on the morning of 23 December 1984. Unable to contact his roommate, the victim telephoned his next-door neighbor on that same morning and left a message that he was traveling to North Carolina with defendant. Defendant did in fact travel to North Carolina on 23 December, stayed overnight at his summer home there, and departed for Smyrna once again late in the afternoon on the following day, 24 December. The victim's body was located

on 26 December along the side of Highway 276 at a spot only 9.5 miles from defendant's home.

Phenolphthalein and luminol testing by law enforcement officers yielded positive reactions, presumptively indicating the presence of blood, at numerous sites in defendant's home and in his brown Pontiac automobile. Among the sites testing positively for blood were metal shavings attached to newly drilled holes in the trunk of defendant's automobile. Rope found at the scene and green paint found on that rope were similar to rope and paint found at defendant's house. Finally, shotgun wadding and pellets removed from the victim's body were consistent with ammunition discovered at defendant's house.

It is undeniably true that defendant's challenge to the sufficiency of evidence in this case reveals a close question. Nevertheless, it is our firm belief that all the evidence, when viewed in the light most favorable to the State and when granted every reasonable inference, is such that a reasonable juror might conclude that it was this defendant who committed the murder of Steven Wade Boyer. This case was for the jury, and the trial court therefore acted properly in denying defendant's motion to dismiss at the close of all of the evidence. Defendant's first assignment of error is hereby overruled.

II.

[2] In his next assignment of error, defendant asserts that the trial court committed reversible error in refusing to admit into evidence defendant's proposed Exhibit No. 34. The exhibit in question is a drawing found by law enforcement officers among the victim's personal effects which includes a rough map of the area surrounding defendant's North Carolina home and numerous written notations indicating a possible larceny scheme. Defendant argues specifically, first, that Exhibit No. 34 was clearly relevant to a crucial issue in the case, to wit, whether this defendant, and not some other person, was in fact the perpetrator of the crime and that it therefore should have been admitted into evidence at trial. This evidence of a possible larceny scheme involving defendant's North Carolina home, claims defendant, together with other evidence that the victim argued with and then departed with the occupants of another vehicle at Denny's Restaurant on the day of his final disappearance, casts doubt upon the State's position that

it was this defendant who was responsible for the victim's demise. Defendant argues, second, that because the State's case against him was based entirely on circumstantial evidence and because the evidence in question casts doubt upon such a fundamental part of the State's case—namely, that defendant was in fact the perpetrator of the crime—the trial court's error in failing to admit the exhibit was prejudicial error entitling him to a new trial. We agree with defendant, and accordingly, we order a new trial.

In his first argument, defendant asserts, correctly in our view, that defendant's proposed Exhibit No. 34 was clearly relevant to a crucial issue in the case and should have been admitted by the trial court. As stated above, the exhibit in question is a drawing found by law enforcement officers among the victim's personal effects which includes, first of all, a map. The map is unambiguously a rough rendering of the area surrounding defendant's summer home in North Carolina and includes the location of defendant's home in relation to other landmarks as well as a portrayal of certain roads in the vicinity. The drawing also includes numerous notations indicating the possible existence of a larceny scheme with defendant's summer home as its target. Among these notations are a series of numbers corresponding to a safe combination at defendant's home and a list which includes such entries as "be sure they're here," "alibi," "how to conceal bike," and "lay bike flat."

Defendant argues, in essence, that Exhibit No. 34 should have been admitted at trial because it casts doubt upon a fundamental element of the State's theory of the case—namely, that the victim met his demise at the hands of this defendant and not someone else. Defendant produced evidence at trial tending to show that the victim talked briefly with several other persons while he was in the Denny's Restaurant parking lot with defendant on 23 December, that the victim argued with those persons, and that the victim subsequently left with those persons in their vehicle. Defendant no doubt hoped to persuade the jury that the victim, along with the other persons at the Denny's Restaurant parking lot, was engaged in a scheme to rob defendant's summer home, that the victim had a falling out with those persons, and that the victim was in fact done in by his co-conspirators—all of this in the hope that one or more of the jurors would develop a reasonable doubt as to defendant's role as the perpetrator of the

crime. The exhibit was a crucial part of defendant's effort in that it might have provided evidence that the victim in fact contemplated and planned such a robbery, and more importantly, that he shared his knowledge of the location of the house, the relevant roads, the combination to defendant's safe, and other details of the plan with co-conspirators by drawing these things out on paper for them. Thus, defendant asserts that he was robbed of a crucial opportunity by the trial court's ruling on the piece of evidence in question. We agree.

As an initial matter, we note that the relevance standard to be applied in this and other cases is relatively lax. After all, evidence is relevant if it has "*any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1986) (emphasis added). *See also State v. Goodson,* 313 N.C. 318, 327 S.E. 2d 868 (1985). Relevant evidence, as a general matter, is considered to be admissible. N.C.G.S. § 8C-1, Rule 402 (1986). We note also that the standard in criminal cases is particularly easily satisfied. "Any evidence calculated to throw light upon the crime charged" should be admitted by the trial court. *State v. Huffstetler,* 312 N.C. 92, 104, 322 S.E. 2d 110, 118, *cert. denied,* 471 U.S. 1009, 85 L.Ed. 2d 169 (1984).

We find that we are in agreement with defendant that the exhibit in question in this case was relevant to a crucial issue — namely, whether defendant was in fact the true perpetrator of the crime — and that the exhibit was therefore wrongly rejected by the trial court. In this case, the State had the burden of presenting evidence of each of the essential elements of the crime of first-degree murder and, more importantly, of the *defendant's status as the perpetrator of the crime. State v. Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649 (1982). The very existence of the drawing, as defendant argues, indicates that the victim may have contemplated and planned a robbery of defendant's summer home in North Carolina, and more importantly, that he may have shared those plans with one or more co-conspirators. The exhibit, together with the additional evidence of the victim's argument with and ultimate departure with persons other than defendant from Denny's Restaurant on the day of his disappearance, would constitute a possible alternative explanation for the victim's un-

fortunate demise and thereby casts crucial doubt upon the State's theory of the case. We cannot but conclude that Exhibit No. 34 was relevant to a crucial issue in this case and that the trial court therefore erred in refusing to admit it into evidence.

Having determined that the trial court's failure to admit the exhibit in this case was error, the remaining question facing us is whether its action was sufficiently prejudicial to warrant our order of a new trial. Because the evidence against this defendant was entirely circumstantial and because the excluded evidence was relevant to, and cast doubt upon, such a fundamental element of the State's theory of the case, we believe that it was, and we so order.

The burden upon defendant to demonstrate prejudice in a case such as this is described in N.C.G.S. § 15A-1443(a), which provides in pertinent part as follows:

(a) A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant.

N.C.G.S. § 15A-1443(a) (1983).

We believe that defendant has met his burden here. As we stated previously in this opinion, this is a very close case in which there is only circumstantial evidence identifying this defendant, to the exclusion of other persons, as the perpetrator. Moreover, it is this very issue to which defendant's proposed Exhibit No. 34 is relevant since it casts doubt upon the State's evidence that defendant was the killer and suggests instead an alternative scenario for the victim's ultimate demise. We are simply unable to say that, had the trial court properly admitted defendant's proposed exhibit, there is not a reasonable possibility that a different result would have been reached. Accordingly, the trial court's error in failing to admit defendant's exhibit was prejudicial error entitling defendant to a new trial.

### III.

[3] Because of the likelihood that it will recur in the retrial of this case, we now address an important additional assignment of error by defendant. He argues that the trial court committed reversible error in its admission into evidence of a telephone message written by the victim's next-door neighbor, Sherri Elliott, to the victim's roommate. Defendant asserted at trial, and asserts on appeal, that the written phone message constitutes inadmissible and prejudicial hearsay. The State contends that it was admissible under an exception to the hearsay rule. The trial court, over defendant's objection and consistent with the State's contention, found that this highly incriminating evidence was admissible under the residual hearsay exception found at Rule 803(24) of the North Carolina Rules of Evidence. We find that the evidence of the written telephone message is admissible, not under Rule 803(24), but rather under Rule 803(3) as a statement of intent to engage in a future act.

As we stated above in our initial review of the facts, the State presented evidence at trial of a 23 December 1984 telephone call from the victim to his next-door neighbor. Unable to reach his roommate by phone on the morning of his meeting at Denny's Restaurant with defendant, the victim called Sherri Elliott, his next-door neighbor, and left a message. The original message, as written by Ms. Elliott, and as originally proffered by the State, read as follows:

Jim,

Steve called and said that he was riding to Waynesville[,] North Carolina with his father-in-law. If he is not back by 5:00 call the Smyrna Police because something may have happened to him.

Sherri

After conducting a voir dire hearing to determine what, if any, part of the telephone message was admissible under Rule 803(24) of the North Carolina Rules of Evidence, the trial court allowed the State to introduce only this part of the statement:

Jim,

Steve called and said that he was riding to Waynesville[,] North Carolina with his father-in-law.

Sherri

Rule 803(24) of the North Carolina Rules of Evidence, also known as the residual hearsay exception, provides as follows:

> (24) Other Exceptions.—A statement *not specifically covered by any of the foregoing exceptions* but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

N.C.G.S. § 8C-1, Rule 803(24) (1986) (emphasis added).

Because of the residual, "catchall" nature of the Rule 803(24) hearsay exception, it is potentially subject to abuse in the face of unfettered judicial discretion. *State v. Smith*, 315 N.C. 76, 91, 337 S.E. 2d 833, 844 (1985). Accordingly, evidence proffered for admission pursuant to Rule 803(24) must be carefully scrutinized by the trial court within the framework of the rule's requirements. *Smith*, 315 N.C. at 92, 337 S.E. 2d at 844. In *Smith*, this Court interpreted the six-part inquiry in which the trial court must engage pursuant to Rule 803(24) prior to admitting or denying hearsay evidence proffered for purposes of the residual hearsay exception. Specifically, the trial court must determine the following: first, that proper notice was given of the intent to proffer hearsay evidence under Rule 803(24); second, *that the hearsay evidence is not specifically covered by any of the other hearsay ex-*

*ceptions*; third, that the hearsay evidence possesses certain circumstantial guarantees of trustworthiness; fourth, that the evidence is material to the case at bar; fifth, that the evidence is more probative on an issue than any other evidence procurable through reasonable efforts; and sixth, that admission of the evidence will best serve the interests of justice. *Smith*, 315 N.C. at 92-96, 337 S.E. 2d at 844-47.

In the case at bar, Judge Allen engaged in the six-part inquiry required by this Court in *Smith* and made findings in the record as to each of the six components. As to the first portion of the telephone message, Judge Allen determined that all six tests were satisfied, and he admitted the evidence accordingly. In fact, Judge Allen's analysis, though it ultimately yielded the correct result, need not have proceeded beyond the second requirement — namely, that the evidence in question is not specifically covered by any other hearsay exception. We believe that the victim's statement to Sherri Elliott over the telephone that he was going to North Carolina with defendant constitutes a statement by the victim of his then-existing intent to do an act in the future. Accordingly, we hold that this written telephone message is admissible hearsay under Rule 803(3) of the North Carolina Rules of Evidence as evidence of a then-existing mental, emotional, or physical condition. *See* N.C.G.S. § 8C-1, Rule 803(3) (1986).

Rule 803(3) of the North Carolina Rules of Evidence provides as follows:

> (3) Then Existing Mental, Emotional, or Physical Condition. *—A statement of the declarant's then existing* state of mind, emotion, sensation, or physical condition (such as *intent*, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

N.C.G.S. § 8C-1, Rule 803(3) (1986) (emphasis added). Rule 803(3), like the rest of the new evidence rules, became effective only on 1 July 1984, and, before today, no post-Rules case from this Court has dealt with the issue of whether Rule 803(3) allows the admission of a hearsay statement of a then-existing intent to engage in

a future act. Today, we address that issue squarely, and we hold that it does. We hold further that the admitted portion of the written telephone message in this case constituted just such a statement.

Pre-Rules cases from this and other courts are instructive here. In the seminal case of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 36 L.Ed. 706 (1892), for example, a suit was brought on a life insurance policy and was defended on the ground that the insured, Mr. Hillmon, was not dead but, pursuant to a conspiracy to defraud the insurer, had killed his traveling companion, Walters, and left his body to be found at their campsite. The United States Supreme Court, on appeal from a judgment for the plaintiff-beneficiary, granted a new trial for error in excluding as evidence letters written by Walters to his sister and his fiancee, in one of which he wrote, "I expect to leave Wichita on or about March the 5th, with a certain Mr. Hillmon, a sheep-trader, for Colorado or parts unknown to me." *Id.* at 288, 36 L.Ed. at 708. Rejecting plaintiff-beneficiary's hearsay argument, the Court stated that "whenever the *intention* is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party." *Id.* at 295, 36 L.Ed. at 710 (emphasis added).

This Court applied the so-called *Hillmon* doctrine in the important pre-Rules case of *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755, *cert. denied*, 414 U.S. 874, 38 L.Ed. 2d 114 (1971). There, the Court held admissible testimony that the declarant (the victim in a murder case), while preparing to leave home, told his wife that he was going with defendant on a business trip to Wilmington, Delaware. The Court stated that "[t]he sound basis for its admission is . . . the exception to the hearsay rule permitting the admission of declarations of a decedent to show his intention, when the intention is relevant per se and the declaration is not so unreasonably remote in time as to suggest the possibility of a change of mind." *Id.* at 587, 180 S.E. 2d at 772.

In *State v. Cawthorne*, 290 N.C. 639, 227 S.E. 2d 528 (1976), a pre-Rules case strikingly similar in its facts to the case at bar, this Court followed *Vestal* in holding that the admission of certain hearsay evidence was proper. There, a Yellow Cab dispatcher testified that after she directed one of the drivers to go to the Red

Carpet Inn, the driver called in on his radio to say that he had picked up the fare and that he was taking his passengers to a particular location just off Highway No. 17. The driver was subsequently shot and killed during the course of an armed robbery. The Court held that "[the driver's] challenged statement to the dispatcher was properly admitted . . . under the exception to the hearsay rule enunciated in *State v. Vestal.*" *Id.* at 649, 227 S.E. 2d at 533.

The exception to the hearsay rule exemplified in the *Hillmon, Vestal,* and *Cawthorne* decisions is now codified in the Federal Rules of Evidence and, in our view, is inherent in the recently adopted North Carolina Rules of Evidence. The Commentary to Rule 803(3) of the Federal Rules of Evidence explicitly embraces the *Hillmon* doctrine, noting that "[t]he rule of *Mutual Life Ins. Co. v. Hillmon* allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed." Fed. R. Evid. 803(3) advisory committee's note (citation omitted). North Carolina Rule of Evidence 803(3) is identical to its federal counterpart and, therefore, should also be read to embrace the rule announced in the *Hillmon* case and applied in this Court's own decisions. We find support for our position in Dean Brandis' commentary to Rule 803(3):

> [A]dmitting [a statement of intent] to prove subsequent conduct in accordance with the expressed intent is squarely within the Rule, provided the time lapse is not so great as to make the statement too remote to be acceptably relevant.

1 Brandis on North Carolina Evidence § 162 (1986 Cum. Supp.).

In the case at bar, Judge Allen ruled correctly but for the wrong reason. In his telephone conversation with Sherri Elliott, the victim stated his then-existing intent to engage in a future act—namely, that he was going to North Carolina with defendant. Hearsay evidence in the admitted portion of the statement was admissible at trial, not pursuant to Rule 803(24), but rather, pursuant to the *Hillmon* doctrine incorporated within Rule 803(3). At defendant's new trial, this evidence, if introduced, would be admissible. As the question was neither briefed nor argued, we express no opinion as to the admissibility of that part of the telephone message not admitted at defendant's first trial.

In conclusion, we have reviewed the entire record and each of defendant's assignments of error in this case. We hold, pursuant to our discussion in Part II of this opinion, that the trial court committed prejudicial error in failing to admit certain relevant and potentially exculpatory evidence offered by defendant. Accordingly, the result is a

New trial.

Justice MITCHELL dissenting.

I dissent from that part of the opinion of the majority holding that the trial court committed prejudicial error by excluding a drawing found in the victim's home among his personal effects and from the result reached by the majority. I believe the trial court properly excluded the drawing.

We have held that:

> A defendant may introduce evidence tending to show that someone other than defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible. *State v. Stanfield*, 292 N.C. 357, 233 S.E. 2d 574 (1977); *State v. Jenkins*, 292 N.C. 179, 232 S.E. 2d 648 (1977); *State v. Shinn*, 238 N.C. 535, 78 S.E. 2d 388 (1953); *State v. Smith*, 211 N.C. 93, 189 S.E. 175 (1937). '[T]he admissibility of another person's guilt now seems to be governed, as it should be, by the general principle of relevancy under which the evidence will be admitted unless in the particular case it appears to have no substantial probative value.' 1 Stansbury's N.C. Evidence § 93 at 302-03 (Brandis rev. 1973).

*State v. Hamlette*, 302 N.C. 490, 501, 276 S.E. 2d 338, 346 (1981). I see no reason to believe this rule has been altered by the adoption of Chapter 8C of our General Statutes, the North Carolina Rules of Evidence. I do not agree with the majority that the drawing constituted a "possible alternative explanation for the victim's unfortunate demise and thereby cast crucial doubt upon the State's theory of the case." The drawing has absolutely no tendency to implicate any person other than the victim in anything. Even viewing the drawing in the light most favorable

to the defendant, it can only be said at most to give rise to speculation or conjecture of a type which until now has not been viewed as sufficient to render evidence either relevant or admissible.

The majority's discussion of this issue reveals on its face the extreme speculation and conjecture which must be employed in order to warp this evidence to fit our rules. The majority says that the drawing indicates that the victim "may" have planned a robbery of the defendant's North Carolina home. The majority then speculates that the victim "may" have shared those *possible* plans with one or more co-conspirators. The majority then concludes that such speculation stacked upon conjecture could lead a jury to find a "possible" alternative explanation for the victim's death. It seems clear to me that the drawing should have been excluded from evidence because it neither tended to exculpate the defendant nor inculpate any other person. *See State v. Rogers,* 316 N.C. 203, 341 S.E. 2d 713 (1986); *State v. Gaines,* 283 N.C. 33, 194 S.E. 2d 839 (1973).

Even if it is assumed — erroneously in my view — that the drawing found among the personal effects of the victim was admissible, I do not believe the defendant has carried his burden of showing a "reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial . . . ." N.C.G.S. § 15A-1443(a) (1983). From substantial evidence introduced at trial, the jury could and apparently did believe that the victim — or more accurately a large part of him — was taken away from the defendant's home by the defendant in his car trunk after the defendant had murdered and butchered the victim. The evidence of the defendant's activities at his home at about the time the murder must have occurred was more than sufficient to permit the jury to find that the defendant killed the victim there, then cut off his head and hands to prevent identification of the body before dumping it beside the highway. The evidence was also sufficient to support a reasonable jury finding that the defendant then returned to his home in North Carolina and, before hiding the car used to transport the body, drilled holes in the trunk and washed it out in a nearly successful effort to remove all evidence of bloodstains.

Substantial evidence tended to show that the defendant murdered and butchered the victim in the defendant's home before

dumping his body by the side of the road. Even if one were inclined to join the majority in its pure speculation and conjecture that the victim planned to rob the defendant's home, this would be one more piece of evidence tending to indicate that the victim was in the home at the time he was murdered and his dismembered body removed from the home by the defendant in the defendant's car. The possibility that some phantom "others" may have been present in the defendant's home with the victim is the sheerest speculation and conjecture not supported by either substantial or insubstantial evidence.

For the foregoing reasons, I dissent from the result reached by the majority and vote to find no error in the trial of this case.

Justices MARTIN and FRYE join in this dissenting opinion.