STATE OF NORTH CAROLINA v. JOHN NEWMAN MONTGOMERY

No. 46

(Filed 4 November 1976)

1. **Constitutional Law §§ 31, 32— indigent defendant — no right to investigator at State expense**

Defendant, an indigent charged with first degree rape, was not entitled to have the trial court appoint, at State expense, a private investigator to assist his counsel in the areas of pretrial publicity and potential alibi witnesses, since there was nothing to indicate that the employment of an investigator would have been of any assistance whatever to defendant's counsel. G.S. 7A-450(b).

2. **Criminal Law § 66— composite picture of rapist — admissibility**

In a first degree rape prosecution the trial court did not err in allowing into evidence a photograph of a composite picture of the assailant prepared by a detective in collaboration with the victim· of the alleged attack, and there was nothing improper in the preparation of the composite or in allowing the victim's two companions to view it and determine that it portrayed the man with whom they had talked.

3. **Criminal Law § 66— photograph of lineup shown to rape victim and companions — admissibility of photograph**

The trial court in a first degree rape prosecution did not err in allowing into evidence a photograph of a lineup and of seven men, including defendant, which the victim of the alleged rape and her companions viewed and from which they identified defendant as the perpetrator of the alleged rape, where the evidence tended to show that the photograph shown to the three witnesses was taken a year before the offense in question occurred; the picture showed defendant in a group of seven young, white men, all save one of approximately the same age, size, build, clothing and coloring; and there was no indication of any inducement of the witnesses by the officers to select any one man over the other six as the perpetrator of the crime.

4. **Criminal Law § 66— rape victim and companions — in-court identification of defendant proper**

The trial court in a first degree rape prosecution did not err in allowing the victim and her two young companions to make in-court identifications of defendant, since the testimony on *voir dire* clearly showed that each of the witnesses was in the presence of the defendant shortly after noon on a clear, sunlit day, was in close proximity to him, walked and talked with him for a substantial period of time, and had ample opportunity to observe his appearance; moreover, each witness testified that her or his identification of defendant in court was based upon what she or he observed on the date of the offense.

5. **Criminal Law § 66— photograph from police files — showing to witness — no violation of constitutional rights**

Where nothing upon a photograph taken from police files suggests the selection of the defendant as the perpetrator of the offense

State v. Montgomery

presently under investigation, the exhibition of such photograph to a witness for purpose of identification of the defendant as the perpetrator of the offense presently under investigation is not, *per se*, a violation of the defendant's constitutional rights, notwithstanding absence of evidence showing the circumstances under which the photograph was obtained by police.

6. **Criminal Law § 66— in-court identification — subsequent objection and request for voir dire — objection too late**

Where defendant waited until after a witness had positively identified him in court before he objected and then moved to strike the testimony and requested a *voir dire*, the trial court did not err in overruling the objection and denying the request for the *voir dire* on the ground that the objection was too late.

7. **Criminal Law § 89— detective's conversation with rape victim — admissibility for corroboration**

The trial court in a first degree rape case did not err in allowing a detective to testify concerning his conversation with the victim in the course of constructing a composite picture of her assailant, since the purpose of the testimony was to show the procedure followed in the construction of the composite; the testimony was substantially in corroboration of the victim's own testimony; and the court properly limited it to that purpose.

8. **Criminal Law § 53— rape prosecution — Pap smear — admissibility of evidence**

In a first degree rape prosecution the possibility that within the Pathology Department of the hospital to which the victim was taken a Pap smear of the victim could have been interchanged with another taken from a different patient was too remote to require the trial judge to grant defendant's motion to strike the testimony of the pathologist who examined the Pap smear.

9. **Criminal Law § 46— flight of defendant — evidence admissible — instruction proper**

The trial court in a first degree rape case did not err in admitting the testimony of two police officers indicating flight by defendant some three or four days after the offense was committed, nor in instructing the jury with reference to flight as a circumstance which the jury might consider as showing consciousness of guilt.

10. **Criminal Law § 95— testimony competent for restricted purpose — failure to request limiting instruction — general objection properly overruled**

Though a police officer's testimony in rebuttal to two of defendant's alibi witnesses was competent only for the purpose of impeaching the credibility of those witnesses, in the absence of a request by defendant for an instruction limiting the jury's consideration of the testimony to the issue of credibility, the overruling of defendant's general objection without such limiting instruction was not error.

11. **Constitutional Law § 36; Rape § 7— first degree rape — life imprisonment substituted for death penalty**

A sentence of life imprisonment is substituted for the death penalty imposed in a first degree rape case.

12. **Criminal Law §§ 145, 154— unnecessary pages in record on appeal — cost of printing taxed against defense counsel**

Pursuant to Rule 9(b)(5) of the Rules of Appellate Procedure, the cost of mimeographing 68 pages of the record on appeal concerning the selection of the jury to which no assignment of error discussed in the brief of the appellant related is taxed against defendant's attorney.

APPEAL by defendant from *Rousseau, J.,* at the 5 January 1976 Criminal Session of FORSYTH.

Upon an indictment, proper in form, the defendant was tried and convicted of rape in the first degree. He was sentenced to death.

The defendant did not testify in his own behalf but offered witnesses whose testimony tended to establish an alibi.

The State introduced evidence to the following effect:

Shortly after noon on Saturday, 6 July 1974, the victim of the offense, then a 15 year old girl, two neighbor boys, then 13 and 11 years of age, and a still younger sister of the boys were sitting in a churchyard near their homes talking. A man, positively identified in court by the victim and by each of the two boys, came upon the church property, told the children he was from Connecticut and was visiting friends and had lost his little Chihuahua dog. He asked them if they had seen the dog and, upon their telling him they had not, he left, asking them to keep a watch for it.

After a few minutes the man returned and, the children having told him they had still not seen the dog, he asked them to help him look for it. Thereupon, the younger girl went back to her home and the other three children went with the man to help him search for the dog, walking along a railroad track and thence along a dirt road until they reached a trail which led to a horse barn. At that point they separated, the two boys going to the barn and the man and the girl proceeding along the road for a short distance. The man then suggested that they turn back. As they started back, the man seized the girl. She screamed and tried to get away but he threw her to the ground, held an open pocket knife, with a blade two inches long, against

her side and told her that if she did not keep quiet he would kill her. He then pulled her up and, with his arm around her neck, dragged her into a hay field, in which the grass was quite high.

There he again threw the girl to the ground and, still holding the knife, ordered her to remove her shorts and underwear, which she did. He then proceeded to have sexual intercourse with her, penetrating her. Thereafter, he told her that if she said anything about the occurrence to anyone, he would come back and kill her. He then departed, taking with him the garments he had forced her to remove, saying he would leave them at the road, which he did. After he left, the girl made her way back to the road, found her clothing, put it on, and returned to the point where she and the man had separated from the two boys. There the boys rejoined her and she told them what had occurred.

The police were notified and, after she informed them what had happened and described her assailant, the girl was taken to a hospital where she was examined. A Pap smear disclosed the presence of sperm. She had not previously had sexual intercourse. She was wearing "pierced earrings," one of which was pulled out in the struggle. When she arrived at the hospital there was blood on her neck.

She described her assailant to the investigating police officers as a man about 5 feet 8 inches tall, weighing about 150 pounds, having dark hair and eyes and wearing blue jeans, a T-shirt and black shoes. She described the length of his hair and how it was combed.

Two days after the occurrence, the girl collaborated with a police detective in constructing, partially with plastic materials and partially by drawing upon such materials, a composite picture of her assailant. Upon being shown this composite picture, each of the young boys said it looked like the man. Thereafter, the girl was shown a lineup photograph, made approximately a year prior to this occurrence, in which the defendant and five other young, white men of approximately the same age, size, build, coloring and dress were shown. Upon seeing this, she immediately identified the picture of the defendant therein as that of her assailant. Upon being shown the lineup photograph, each of the boys also immediately picked the picture of the defendant therein as that of the man with

State v. Montgomery

whom they and the girl had gone to look for the dog. Both the composite picture and the lineup photograph were put in evidence. Each of the two boys testified to the same effect as did the girl up to the point where they left the man and the girl and went toward the horse barn. Each also corroborated her testimony as to what occurred when they rejoined her.

At about 1:00 p.m., on the day in question, Mr. A. P. Warner was working around his son's store not far from the church where the children were first accosted. This being Saturday, the store was about to close. Mr. Warner observed a car drive in and park at the back of the store. The driver got out and proceeded rapidly to the road. After the store was closed, the car was still parked at the rear of the building and Mr. Warner made a note of the license number. The driver then returned, spoke briefly to Mr. Warner and drove away. After reading about the assault upon the girl in the next day's newspaper, Mr. Warner reported to the police what he had seen, describing the car and giving the license number. He positively identified the defendant, in court, as the driver of the car.

The police ascertained that the car so observed by Mr. Warner was registered in the name of the defendant's father. Having obtained a warrant for the defendant's arrest, officers proceeded to the father's residence and found an automobile fitting the description given by Mr. Warner and bearing the said license number. The defendant was not there. He and his wife had been staving at his father's residence, but on Wednesday after this offense occurred he left for a destination not disclosed to his wife or parents. He was arrested a year later in Syracuse, New York.

During his absence his wife, a witness called by the defendant to establish his alibi, had no communication with him except for one telephone call, the date of which she did not remember. She was unable to write to him. The defendant's brother, also called as a witness for the defendant for the same purpose, likewise testified on cross-examination that between the defendant's departure and his return, in custody, he had no correspondence with the defendant but did talk to him once by telephone. The brother does not know where the defendant was.

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the State.*

*D. Blake Yokley for defendant.*

LAKE, Justice.

The defendant attacks the judgment of the Superior Court alternatively. First, he contends that he is entitled to a new trial for errors in the admission of evidence, in the instructions of the court to the jury and in the denial of certain pretrial motions. Second, he contends that, if the trial was free from error in these respects, the imposition of the sentence to death was a violation of his rights under the Constitution of the United States.

We find no merit in any of his assignments of error relating to his first contention. Since we are compelled to accept as correct, interpretations placed by the Supreme Court of the United States upon provisions of the United States Constitution and to comply with and to follow its decisions applying those provisions to the statutes of this State, and since that Court, in *Woodson v. North Carolina,* _ U.S. ___, 96 S.Ct. 2978, 49 L.Ed. 2d 944 (1976), held that the provisions of G.S. 14-17, imposing the death penalty for murder in the first degree, violate the Constitution of the United States and, so, may not be given effect by the courts of North Carolina, and since the provisions of G.S. 14-21, imposing the death penalty for the offense of first degree rape, cannot be distinguished, in this respect, from the provisions of G.S. 14-17, we must hold that there is merit in the defendant's attack upon the death sentence imposed upon him.

We turn first to the assignments of error which the defendant says entitle him to a new trial.

[1] Some two months prior to trial the defendant, through his court appointed counsel, moved that the court appoint, at State expense, a private investigator to assist his counsel. At the pretrial hearing of the motion, the defendant's counsel stated that he had interviewed his client at length and talked with members of the family. He advised the court: "[T]here is extensive investigation that needs to be done in the area of pretrial publicity. There is extensive investigation that needs to be done in other counties in the form of interviewing poten-

tial witnesses for the defendant as well as other witnesses who may appear in the case. I don't know what the strategy of the District Attorney will be at this time."

Eighteen months elapsed between the commission of the offense and the trial. The complete procedure followed in the selection of the jury is set forth in the record on appeal. Nothing therein, or elsewhere in the record, indicates the nature of any pretrial news story about the alleged offense or that the jury panel, or any member of it, was affected by any publicity given to it. The defendant did not exhaust the peremptory challenges allowed him by the law of the State. The defendant, who did not take the stand as a witness in his own behalf, sought to establish an alibi through testimony of his mother, his wife, his brother and a friend. Nothing whatever in the testimony of these witnesses, or elsewhere in the record, suggests the existence of any other person who might have testified that he or she observed the defendant at any place other than the scene of the alleged rape at or about the time when it is alleged to have occurred. The defendant, himself, was obviously the person best prepared to inform his counsel as to his whereabouts at the time in question and as to the identity of any person who might be able or willing to testify in support of his alibi. Nothing whatever in the record suggests the existence of any person who might be able or willing to testify that the alleged offense did not occur, or that it was perpetrated by someone other than the defendant. Consequently, there is nothing to indicate that the employment of an investigator would have been of any assistance whatever to counsel appointed by the court to represent the defendant in this matter.

G.S. 7A-450 (b) provides: "Whenever a person, under the standards and procedures set out in this subchapter, is determined to be an indigent person entitled to counsel, it is the responsibility of the State to provide him with counsel *and the other necessary expenses of representation.* * * *." (Emphasis added.) This statute has never been construed to extend to the employment of an investigator in the absence of a showing of a reasonable likelihood that such an investigator could discover evidence favorable to the defendant. We decline so to construe it. We do not have before us, and do not pass upon, the right of an indigent defendant to have such an investigator employed at the expense of the State upon a showing of a reasonable basis for belief that such employment would be pro-

ductive of evidence favorable to him. See *State v. Tatum,* 291 N.C. 73, 229 S.E. 2d 562, decided this day.

Pursuant to G.S. 7A-465, the office of "Public Defender" has been established in five of the 30 judicial districts of this State, Forsyth County is not being included in any of these. G.S. 7A-468 provides: "Each Public Defender is entitled to the service of one investigator, to be appointed by the Defender to serve at his pleasure. The Administrative Officer of the Courts shall fix the compensation of each investigator, and may authorize additional investigators, full-time or part-time, upon a showing of need." Nothing in this statute requires or contemplates the employment or use of an investigator for the purpose of embarking upon a statewide, or worldwide, search for evidence in the absence of any indication whatever that such evidence exists anywhere. We have not been advised of any such use of his investigative staff by any Public Defender in the State.

The contention of the defendant that the refusal of the court to appoint a private investigator to assist his counsel denies him his constitutional right to counsel in violation of the Sixth Amendment to the Constitution of the United States and his constitutional right to equal protection of the laws in violation of the Fourteenth Amendment thereto is without merit.

In *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963), the Supreme Court of the United States said, "[R]eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." The court, therefore, held that the right to counsel, guaranteed, as against the Federal government, by the Sixth Amendment to the United States Constitution, was extended by the Fourteenth Amendment to the states.

Clearly, an indigent charged with first degree rape, for which the statutory penalty is death (presently life imprisonment), is entitled to counsel appointed by the court and paid by the State. G.S. 7A-450 (b) so provides. In recognition of this constitutional and statutory right, counsel was appointed for this defendant and diligently represented him at the trial and in this Court. It does not follow that, without any showing of a reasonable basis for believing that substantial benefit to the

defendant would result therefrom, the State must also appoint, at its expense, a private investigator for use of such appointed counsel. Our attention has been directed to no decision of the Supreme Court of the United States so indicating and we decline so to hold. The Equal Protection Clause does not compel the waste of the public's money in Forsyth County merely because it is theoretically possible that some public defender in another judicial district may be extravagant in his use of investigators appointed to assist him, nor is this required merely because some wealthy person accused of a crime may see fit to spend his own money in extravagant and unpromising investigation.

The defendant, by his plea of not guilty, puts in issue all material elements of the State's case. However, where, as here, the defendant seeks to establish an alibi, the crucial question is that of identification of the defendant as the perpetrator of the alleged offense. In the present case, the in-court identification of the defendant as the perpetrator of the alleged rape was clear and positive by each of the three witnesses present at and shortly before the commission of the offense. Their testimony was corroborated, and the defendant's effort to establish an alibi was dealt a staggering blow, by the positive in-court identification of the defendant by Mr. Warner as the driver of the automobile parked in the close vicinity of the alleged crime at approximately the time the State contends it was committed and traced by the officers to the defendant's then place of abode. The defendant contends that each of these in-court identifications was improperly admitted in evidence. We find no merit in these contentions.

[2] As to the identification of the defendant by the victim of the alleged rape and by her two young companions, the defendant contends that these were based upon unlawful out-of-court photographic identification. The first picture so observed by these three witnesses was the composite picture of the assailant prepared by Detective Barker in collaboration with the victim of the alleged attack. She, not the detective, selected the plastic components (eyes, hair, nose, ears, lips, etc.) which went into the basic composite picture and then, from her recollection of the appearance of her assailant, directed the detective in the drawing in of details necessary to make the final product represent her recollection of the appearance of the man who raped her. The two boys, seeing the final result, agreed that

State v. Montgomery

it properly portrayed the man with whom they had conversed and walked from the churchyard to a point near the place of the alleged crime. At this stage, none of these witnesses knew the defendant and nothing in the record indicates that he was then suspected by the artist or any other police officer. The purpose of this picture was not to convict the defendant but to describe the offender. It was merely a recording of the image of the offender then fresh in the minds of each of these witnesses. Clearly, there was nothing improper in this portion of the out-of-court identification, or in the admission of the photograph of the composite in evidence.

[3] After the composite was completed, these three witnesses were shown (separately, so far as the record indicates) a picture of seven men, including the defendant, in a lineup and were also shown a smaller print of the same picture with one of the men, a deputy sheriff, deleted therefrom. Each of these three witnesses, without hesitation, picked the defendant, as shown in that photograph, as the perpetrator of the alleged rape. It is interesting to note that the defendant's objection to the use of this photograph is that, of all the men in it, he was the one who most closely resembled the composite prepared with the collaboration of the victim of the alleged assault.

⟨ The picture so exhibited by the officers to these three witnesses was not prepared after the officers had come to suspect the defendant as the alleged rapist and for the purpose of assisting these witnesses to identify him as such. This picture was taken a year before this offense occurred. It shows the defendant in a group of seven young, white men, all save one (a deputy sheriff) of approximately the same age, size, build, clothing and coloring.

Due process of law does not require that all participants in a lineup or in a photograph, viewed by the victim of or witness to a crime, be identical in appearance, for that would, obviously, be impossible. All that is required is that the lineup or photograph be fair and that the officers conducting the investigation do nothing to induce the witness to select one participant or subject rather than another. This record contains no indication of any such inducement by the officer who exhibited this photograph to these witnesses.

Prior to trial, the defendant moved to suppress any in-court identification of the defendant based on these photographs. The

State v. Montgomery

court conducted a voir dire at which the defendant offered no evidence. The witnesses for the State upon the voir dire were the girl and her two young, male companions who testified as above summarized. The defendant offered no evidence on the voir dire. There was no evidence whatever of any suggestive procedure or of anything else creating a substantial likelihood of misidentification. Under these circumstances, there was no error in admitting the photograph of the lineup in evidence. *State v. Shutt,* 279 N.C. 689, 698, 185 S.E. 2d 206 (1971).

At the conclusion of the voir dire, the court found, as to each of these three witnesses, that her or his in-court identification of the defendant was not tainted by any improper out-of-court procedure or suggestion and that no improper out-of-court identification procedure was involved. The court also expressly found, as to each of the two young boys, that his in-court identification of the defendant was based upon his having seen the defendant on 6 July 1974, the date of the alleged offense. While there was no such express finding with reference to the girl's in-court identification of the defendant, the findings and order of the court clearly and necessarily implied a like finding as to her. Accordingly, the court denied the motion to suppress the in-court identification testimony of each of these witnesses. Such findings of fact made by the trial judge are conclusive if supported by competent evidence in the record. *State v. Morris,* 279 N.C. 477, 183 S.E. 2d 634 (1971) ; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966).

[4] The evidence overwhelmingly supports each of these findings and, indeed, there is no evidence to the contrary. The testimony on the voir dire clearly shows that each of these witnesses was in the presence of the defendant shortly after noon on a clear, sunlit day, was in close proximity to him, walked and talked with him for a substantial period of time, and had ample opportunity to observe his appearance. Each testified that her or his identification of the defendant in court was based upon what she or he observed on the date of the offense.

[5] Nothing whatever indicates that the lineup picture of the defendant was unlawfully obtained or that, at the time it was taken, this defendant was accused of any crime or that he did not voluntarily participate in the lineup. Where nothing upon a photograph taken from police files suggests the selection of the defendant as the perpetrator of the offense presently under

investigation, the exhibition of such photograph to a witness for purpose of identification of the defendant as the perpetrator of the offense presently under investigation is not, per se, a violation of the defendant's constitutional rights, notwithstanding absence of evidence showing the circumstances under which the photograph was obtained by the police. *State v. Hatcher*, 277 N.C. 380, 177 S.E. 2d 892 (1970).

There was, therefore, no error in admitting the in-court identification testimony of the girl and her two young companions.

[6] Mr. Warner positively identified the defendant in the courtroom as the man whom he saw park the automobile, subsequently identified as belonging to the defendant's father, at the store operated by Mr. Warner's son at about the time of the occurrence here in question. It was not until after he had done so that the defendant objected, moved to strike his testimony and requested a voir dire. The court overruled the objection and denied the request for the voir dire, saying the objection was too late. In this there was no error. Stansbury, North Carolina Evidence (Brandis Rev.) § 27.

On cross-examination Mr. Warner testified that the day before he was called to the witness stand, he saw the above mentioned lineup photograph and recognized the defendant therein and he knew the defendant was under arrest, charged with the offense for which he was then being tried, but said, "The fact that I knew that did not make it easier for me to point the finger at him and say he's the man I saw get in that car that day."

[7] The defendant's contention that the court erred in permitting Detective Barker to testify concerning his "conversation" with the victim of the alleged rape in the course of constructing the composite picture of her assailant is without merit. Primarily, the officer testified as to what he told the girl and what he asked her in the construction of this composite picture. In one or two instances the witness told of the girl's objection to a specific feature of the composite picture then in course of construction and of her suggestion for its correction, which suggestion the witness followed. The purpose of the testimony was to show the procedure followed in the construction of the composite. It was substantially in corrobora-

tion of the girl's own testimony and the judge limited it to that purpose. There was no error in the admission of this evidence.

[8] There was no error in the denial of the defendant's motion to strike the testimony of Dr. Lide, the pathologist who examined the Pap smear taken by Dr. Walker from the victim of the attack. Dr. Walker had previously testified that he, himself, took the smear in the hospital emergency room and personally carried it to the pathology laboratory of the hospital and wrote the request slip for its examination by that department. Dr. Lide, the pathologist, testified that he, himself, examined a Pap smear identified as that taken from the girl. He did not remember, and Dr. Walker apparently did not, whether the smear was actually handed to him by Dr. Walker or possibly passed through the hands of one other person. The possibility that within the Pathology Department of this hospital this smear could have been interchanged with another taken from a different patient is too remote to require the trial judge to grant the motion to strike the testimony of Dr. Lide. It would go only to the weight to be given the testimony by the jury.

[9] There was no error in admitting in evidence the testimony of Police Officers Stimpson and Clopton indicating flight by the defendant some three or four days after the offense was committed, nor in the instruction by the court to the jury with reference to flight as a circumstance which the jury might consider as showing consciousness of guilt. Flight from the scene of a crime does not create a presumption of guilt but it is a circumstance which the jury may consider in determining whether the totality of the circumstances shows a consciousness of guilt on the part of the defendant. *State v. Lampkins*, 283 N.C. 520, 196 S.E. 2d 697 (1973) ; Stansbury, North Carolina Evidence (Brandis Rev.) § 178. The court so instructed the jury.

[10] After the defendant had introduced the testimony of his brother and that of his friend, Joseph Michael Cook, to the effect that the defendant was in their company at another place, so near to the time of the alleged offense for which he was on trial that it would not have been possible for the defendant to have committed the crime, the State, over objection, called Police Officer Clopton as a rebuttal witness. He was permitted to testify to statements made by these witnesses to

him, shortly after the offense is alleged to have been committed, to the effect that, on the date of the alleged offense, the defendant was not in their presence from 12 o'clock, noon, until more than two hours thereafter (the time within which the State's evidence shows the offense was committed).

Obviously, this evidence, being hearsay, was not competent for any purpose except to impeach the credibility of these witnesses for the defendant. *State v. Cope*, 240 N.C. 244, 81 S.E. 2d 773 (1954) ; Stansbury, North Carolina Evidence (Brandis Rev.) § 46. Had the defendant, in apt time, so requested, the court should have instructed the jury that it might consider this testimony of Officer Clopton for that purpose only. *State v. Norkett*, 269 N.C. 679, 153 S.E. 2d 362 (1967) ; Stansbury, *op. cit.*, § 79. However, no such request is shown by the record. Consequently, the overruling of the defendant's general objection without such limiting instruction was not error. *State v. Goodson*, 273 N.C. 128, 159 S.E. 2d 310 (1968).

The remaining assignments by reason of which the defendant contends he should be granted a new trial have also been carefully considered. None of them has merit and no useful purpose would be served by discussing any of them in detail. Consequently, we find in the record no error which would justify the ordering of a new trial. The defendant has had a fair trial, free from prejudicial error. The jury did not believe his evidence designed to establish an alibi and did believe the evidence of the witnesses for the State. Their verdict will not be disturbed.

[11] By reason of the decision of the Supreme Court of the United States in *Woodson v. North Carolina, supra,* the judgment of the Superior Court sentencing the defendant to death upon this verdict must be, and is hereby, vacated and, by authority of the provisions of 1973 Session Laws, Ch. 1201, § 7 (1974 Session), a sentence of life imprisonment must be, and is, substituted in this case.

This case is remanded to the Superior Court of Forsyth County with directions (1) that the presiding judge, without requiring the presence of the defendant, enter a judgment imposing a sentence of life imprisonment for the first degree rape of which the defendant has been convicted; and (2) that in accordance with this judgment, the Clerk of the Superior Court issue a commitment in substitution for the commitment

heretofore issued. It is further ordered that the Clerk furnish to the defendant and to his attorney a copy of the judgment and commitment as revised pursuant to this opinion.

[12]  The record on appeal includes 68 pages devoted exclusively to the selection of the jury to which no assignment of error discussed in the brief of the appellant relates. The inclusion of this material in the record on appeal caused an utterly useless expense which the State should not be required to bear on behalf of this indigent defendant. Pursuant to Rule 9(b)(5) of the Rules of Appellate Procedure, 287 N.C. 671, 693, the cost of mimeographing these 68 pages of the record on appeal is hereby taxed against the attorney for the defendant.

No error in the verdict.

Death sentence vacated.