STATE OF NORTH CAROLINA v. MICHAEL ANTHONY TAYLOR

No. 170A91

(Filed 4 September 1992)

**1. Evidence and Witnesses § 1233 (NCI4th)— statements to cellmate—cellmate not State agent—no Sixth Amendment violation**

The trial court did not err in concluding that defendant's cellmate was not an agent of the State and that incriminating statements made by defendant to his cellmate were not obtained in violation of defendant's Sixth Amendment right to counsel where no evidence was presented that the cellmate was deliberately placed in the cell with defendant in order to obtain information from him; the cellmate approached the police first; the police had made no previous agreement with the cellmate to obtain information, and the cellmate received no payment or promise for supplying information; the police told the cellmate that they could make no deals in exchange for information and that the cellmate was not an agent of the State; and the cellmate's testimony during the hearing

on the motion to suppress tended to show that defendant voluntarily made all the statements to the cellmate.

**Am Jur 2d, Criminal Law § 970.**

**Denial of or interference with accused's right to have attorney initially contact accused. 18 ALR4th 743.**

2. **Constitutional Law § 353 (NCI4th); Evidence and Witnesses § 1233 (NCI4th)— statements to cellmate—cellmate not State agent—no interrogation—no Fifth Amendment violation**

   Defendant's right against self-incrimination under the Fifth Amendment was neither implicated nor violated by the admission of defendant's statements to a cellmate where (1) the cellmate was not an agent of the State and (2) defendant initiated the conversations with the cellmate and no interrogation occurred.

   **Am Jur 2d, Criminal Law § 936.**

3. **Criminal Law § 101 (NCI4th)— statements by defendant— absence of timely disclosure—failure to inform court**

   The trial court did not err in admitting defendant's statements to a cellmate on the ground that the State failed to produce these statements within the time frame required by N.C.G.S. § 15A-903 where defendant failed to point out anything in the record indicating when the district attorney received or was made aware of the statements, and defendant also failed to show that he brought this alleged violation of the discovery statute to the trial court's attention or sought sanctions because of the alleged violation. When the defendant does not inform the trial court of any potential unfair surprise, the defendant cannot properly contend that the trial court's failure to impose sanctions is an abuse of discretion.

   **Am Jur 2d, Criminal Law § 998.**

4. **Criminal Law § 1233 (NCI4th)— defendant's statements to another prisoner—no constitutional violation**

   The admission of defendant's inculpatory statement to another prisoner did not violate defendant's Fifth or Sixth Amendment rights where the other prisoner was not an agent of the State and there was no interrogation of defendant.

   **Am Jur 2d, Criminal Law § 974.**

STATE v. TAYLOR

[332 N.C. 372 (1992)]

Denial of or interference with accused's right to have attorney initially contact accused. 18 ALR4th 743.

5. **Evidence and Witnesses § 960 (NCI4th)— hearsay—exception for statements of intent**

A murder victim's statement to his supervisor that he wanted time off from work the next day because he planned to meet the defendant and then buy a boat was admissible under the Rule 803(3) exception for statements of then existing intent and plan to engage in a future act. The statement of the victim was sufficiently close in time to the occurrence of the intended future act to be relevant under Rule 401, and no more was required in this regard. N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Evidence § 651.**

6. **Evidence and Witnesses § 960 (NCI4th)— purpose of past meeting—hearsay—inadmissibility as statement of intent**

A murder victim's statement to a coworker that he and an unidentified black man who met with him at work had discussed the sale of a gun shop in South Carolina was hearsay as it was offered to prove that someone other than defendant purchased a gun shop in South Carolina from the victim. This statement was not admissible under the Rule 803(3) exception to the hearsay rule because it was not a statement of future intent but was an inadmissible statement of his memory of a past act offered to prove the fact remembered.

**Am Jur 2d, Evidence § 651.**

7. **Evidence and Witnesses § 1468 (NCI4th)— autopsy testimony— chain of custody of bodies**

The State established an adequate chain of custody for three bodies for the admission of testimony relating to the autopsies of the bodies where a detective testified that he observed the three bodies at the scene; he photographed the bodies and was present at the autopsy for each victim; and the detective identified the clothes on the bodies as the same as the ones on the bodies at the scene. Furthermore, any weak link in a chain of custody goes to the weight of the evidence and not to its admissibility.

**Am Jur 2d, Evidence § 774.**

8. **Evidence and Witnesses § 1467 (NCI4th)— projectile removed from body—chain of custody**

The State established an adequate chain of custody of a projectile taken from a murder victim's body for its admission into evidence where the medical examiner identified the projectile at trial as the one he removed from the victim's body and noted the identification card he had signed that was attached; because of the noticeable distortion of the projectile, witnesses who handled it were able to and did identify it on the basis of this unique characteristic; and each person handling the projectile testified that he had custody of the bullet and it was not altered in any way.

**Am Jur 2d, Evidence § 775.**

9. **Jury § 7.11 (NCI3d)— death qualification of jury— constitutionality**

The trial court properly denied defendant's motion for separate juries during his trial and capital sentencing proceeding on the ground that, even though he received a life sentence, a "death qualified" jury is more likely to convict. The Supreme Court will continue to adhere to its prior decisions rejecting the argument that a death qualified jury is more likely to convict and holding that such a jury does not violate defendant's constitutional rights.

**Am Jur 2d, Criminal Law § 609.**

10. **Jury § 7.11 (NCI3d)— death penalty views—excusal for cause— refusal to allow rehabilitation**

The trial court did not abuse its discretion in refusing to permit defendant to rehabilitate prospective jurors who stated that their personal or religious beliefs on the death penalty would impair their ability to serve as jurors in a capital trial before allowing the prosecutor's challenge for cause of those jurors where defendant made no showing that additional questioning would have resulted in different answers from those jurors.

**Am Jur 2d, Criminal Law § 609.**

11. **Criminal Law § 1431 (NCI4th)— three murders—consecutive sentences—statement of reasons not required—no abuse of discretion**

The trial court was not required to state in the record its reasons for sentencing defendant to three consecutive rather

than concurrent life sentences for three counts of first degree murder, and the trial court did not abuse its discretion in imposing the consecutive sentences. N.C.G.S. § 15A-1354(a).

**Am Jur 2d, Criminal Law § 629.**

APPEAL by the defendant pursuant to N.C.G.S. §7A-27(a) from judgments sentencing him to three consecutive life sentences for three counts of first-degree murder and to a sentence of imprisonment for armed robbery, entered by *Bowen, J.*, on 24 August 1990 in Superior Court, BRUNSWICK County. Heard in the Supreme Court on 12 May 1992.

*Lacy H. Thornburg, Attorney General, by Mary Jill Ledford, Assistant Attorney General, for the State.*

*Daniel F. Read for the defendant-appellant.*

MITCHELL, Justice.

The defendant was tried capitally upon proper indictments charging him with three counts of murder and one count of armed robbery. The State's evidence tended to show the following. On or about 12 October 1988, Marion Meetze, his wife Ginger Meetze, and Ginger's daughter Michelle Arnold were shot and killed in their home in Brunswick County. Evidence tended to show that the defendant, who lived in South Carolina, had purchased a gun shop located in South Carolina from Marion Meetze. A dispute arose between the defendant and Marion Meetze over money related to the sale of the gun shop. The defendant shot and killed the three victims using a different weapon for each murder. Marion Meetze was shot with a shotgun, Ginger Meetze with a .22 caliber pistol, and Michelle Arnold with a Desert Eagle .357 magnum pistol.

Ed Barnett, Marion Meetze's supervisor at work, testified that Meetze was employed at the B.F. Goodrich plant in Wilmington, North Carolina. On 12 October 1988, Meetze asked Barnett for the next day off because the defendant was coming to pay him some money for the sale of the gun shop, and Meetze wanted to go to buy a boat. Barnett gave Meetze permission, and Meetze was not at work on 13 October 1988. Meetze did not come to work on Friday, 14 October 1988. Barnett sent two employees to Meetze's house to check on him that day, because it was unusual for him to miss work without an explanation. The two employees

found the bodies of Marion and Ginger Meetze inside the house and noted that the interior of the house was covered in soot resulting from a fire. The two employees immediately called the sheriff.

Detective Gary Shay arrived at the Meetze home shortly thereafter and found the bodies of Marion and Ginger Meetze in the den. Shay observed that Ginger Meetze had been shot in the head; Marion Meetze had been shot in the back. Shay searched the house and found the body of the child Michelle Arnold in an upstairs bedroom. She had been shot in the chest. In the den, Shay collected nine .22 caliber shell casings and several plastic cups that were sitting on the coffee table and end tables. Latent fingerprints matching those of the defendant were found on one of the cups. Shay also found a plastic pen holder on an end table. In the upstairs bedroom, Shay collected the bedding from the bed on which Michelle Arnold's body was found and found .357 caliber projectiles in the bedding and the pillow on the bed.

The interior of the house was covered with black oily soot. An arson expert testified that the burn patterns showed that the fire started in the back of the house and moved to the front and that a flammable liquid was used to set the fire.

Autopsies revealed that each victim died as a result of multiple gunshot wounds. Marion Meetze was shot in the back with a shotgun. Eight lead pellets were removed from his body. The pellets had passed through his heart and liver. Ginger Meetze was shot nine times: seven times in the back and two times in the head. Seven .22 caliber bullets were removed from her body. Michelle Arnold suffered four gunshot wounds, three of which would have been independently fatal. One .357 caliber projectile was removed from her body.

Roger Benton, the owner of a gun shop in Anderson, South Carolina, testified that the defendant sold him a Desert Eagle .357 magnum pistol on 14 October 1988. Michael McCann, a friend of Marion Meetze, testified that he saw the pistol in the gun shop in October 1988 and recognized it as belonging to Marion Meetze because of its unique serial number. The State entered the gun into evidence at trial. Ed Barnett testified earlier that he had seen that same Desert Eagle .357 magnum pistol at Meetze's house a week before the murders.

Lieutenant Ira Parnell, supervisor of the firearms identification laboratory of the State Law Enforcement Division of South Carolina, conducted ballistics tests on the Desert Eagle pistol the defendant had sold to Benton on 14 October 1988. Parnell concluded that the .357 caliber projectiles taken from the bedding and pillow in the upstairs bedroom and the projectile taken from Michelle Arnold's body had all been fired from that same Desert Eagle .357 magnum pistol.

The defendant presented the following evidence at trial. A fingerprint expert testified that other latent fingerprints found on the plastic cups recovered at the scene of the murders did not match the fingerprints of the defendant or any of the three victims. James Register, a co-worker of Marion Meetze, testified that, during the summer of 1988, a black male unknown to Register visited Marion Meetze at work. Meetze and the man engaged in a heated argument after which Meetze was upset. The man, accompanied by Ginger Meetze and her daughter Michelle Arnold, again visited Meetze at work on 1 July 1988. Meetze appeared upset. On 15 September 1988, the same man again visited Meetze at work. They spoke for about an hour in Meetze's office.

Several witnesses testified that the defendant was a law-abiding, peaceful person. Other evidence introduced at trial is discussed at other points in this opinion where pertinent to the issues raised by the defendant.

The jury found the defendant guilty of three counts of murder in the first degree on the theory that all of the murders were premeditated and deliberate. The jury also found the defendant guilty of armed robbery. At the conclusion of a separate sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court entered sentences of life imprisonment for each of the murder convictions; those sentences were entered to run consecutively. The trial court also sentenced the defendant to imprisonment for a term of fourteen years for the armed robbery conviction. The defendant appealed the first-degree murder convictions and life sentences to this Court as a matter of right. This Court allowed the defendant's motion to bypass the Court of Appeals on his appeal from his conviction and sentence for armed robbery.

[1] The defendant first contends that the trial court erred by denying his motion to suppress statements he made to David Potter

**STATE v. TAYLOR**

[332 N.C. 372 (1992)]

before trial while both of them were in jail. The defendant argues that these statements were made to an agent of the State, while the defendant was in custody and without the presence of counsel, in violation of the defendant's right against self-incrimination under the Fifth Amendment to the Constitution of the United States and his right to counsel under the Sixth Amendment.

At the conclusion of evidence during a suppression hearing, the trial court concluded that David Potter had not acted as an agent of the State and that none of the defendant's state or federal rights were violated. We agree and conclude that the trial court did not err in denying the defendant's motion.

The defendant was arrested for murder on 9 September 1989 and was given the *Miranda* warnings at that time. The trial court appointed counsel for the defendant sometime during September 1989. In late December 1989, the defendant told David Potter, his cellmate in the Brunswick County Jail, that he had killed a man, a woman, and a child. The defendant said he had shot the man with a 12 gauge shotgun one time, that he had shot the woman with a .22 caliber weapon one time in the head, and that he had shot the child with a .357 magnum pistol. The defendant then attempted to set their house on fire, but the fire extinguished itself because of a lack of oxygen. The defendant stated that he had disposed of the guns used in the murders and that the killings had involved a dispute over the sale of a gun shop.

After the defendant made these statements to Potter, Potter asked to speak to an investigating officer. North Carolina State Bureau of Investigation ("S.B.I.") Agent Kelly Moser came to the jail and interviewed Potter on 22 December 1989. During the interview, Potter told Moser everything the defendant had said. At the end of the interview, Moser told Potter not to make any further contact with the defendant about the crimes and specifically told Potter that he was not an agent of the State and was not working for any law enforcement agency. Potter asked if Moser could make a deal to reduce some of the charges against him. Moser stated that he had no authority to make such a deal.

A short time later, Potter requested a second meeting with Moser. Moser interviewed Potter on 28 December 1989. Potter stated that the defendant had said he had taken the murder weapons apart. In addition, the defendant had told Potter that Marion Meetze had placed a pen and pencil carrier on the table in the den before

the defendant shot him. The defendant also stated that the fire he set was smothered. At the end of the interview, Moser again told Potter not to discuss the crimes with the defendant and that Potter was not working for the State. In addition, Moser had Potter sign a statement stating that Moser had told Potter on 22 December and 28 December 1989 to have no further contact with the defendant and that he was not an agent of the State.

On 15 January 1990, Moser interviewed Potter a third time at Potter's request. The defendant had told Potter of an episode of insurance fraud in which the defendant had participated. The defendant also had stated that the police had a weak case against him. The police were looking for a .22 caliber rifle that was supposedly used in one of the murders, when the defendant had actually used a .22 caliber pistol. At the end of the interview, Moser again advised Potter not to have any further discussions with the defendant regarding the offenses.

At Potter's request, Agent Moser again interviewed Potter on 31 January 1990. Potter stated that the defendant had told him that the police had the wrong murder weapon. The police had obtained a stainless steel caliber .22 Ruger pistol, when the defendant had used a blue steel .22 caliber Ruger pistol. The defendant also had recounted further details of the murder. Again, Moser advised Potter not to talk with the defendant about the crimes and that Potter was not working for any law enforcement agency.

In a fifth interview held at Potter's request on 5 February 1990, Potter recounted more details of the murders to Moser. These facts were essentially the same as those previously recounted. Moser again gave Potter the same warnings he had previously given.

Later in February 1990, Potter requested a sixth meeting with Moser. In this final interview, Potter stated that the defendant told him that he had taken the brass from the murder weapons to a scrap metal facility. Moser again gave Potter the same warnings as given at the end of all of the earlier interviews.

After considering the evidence presented at the hearing on the motion to suppress, the trial court concluded in its Order dated 13 August 1990, signed *nunc pro tunc* 18 September 1990, that Potter was not an agent of the State. Furthermore, the trial court concluded that defendant's federal and state constitutional rights had not been violated.

## STATE v. TAYLOR

[332 N.C. 372 (1992)]

The defendant, relying on *United States v. Henry*, 447 U.S. 264, 65 L. Ed. 2d 115 (1980) and *Maine v. Moulton*, 474 U.S. 159, 88 L. Ed. 2d 481 (1985), argues that Potter was an agent of the State. The defendant admits that Potter's first request to speak to an officer about the defendant's case was at Potter's own initiative. Nevertheless, the defendant contends that the State's responses to Potter's requests for the second to sixth interviews show that Moser had an expectation of receiving further information. Therefore, the defendant argues, Potter was an agent of the State who interrogated the defendant in his cell on behalf of the State and in violation of the defendant's rights under the Fifth and Sixth Amendments of the Constitution of the United States.

In *Massiah v. United States*, 377 U.S. 201, 12 L. Ed. 2d 246 (1964), the Supreme Court of the United States first applied the Sixth Amendment to communications between government agents and the defendant after indictment. In that case, the Court reversed the defendant's conviction because the defendant was denied the protection of the Sixth Amendment right to counsel "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 12 L. Ed. 2d at 250. In that case, a co-defendant allowed federal agents to place a radio transmitter under the seat of his car so that the police could overhear an incriminating conversation he had with the defendant. *Id.* at 203, 12 L. Ed. 2d at 248-49. The Court held that the co-defendant acted as an agent of the State and deliberately elicited incriminating information from the defendant without counsel present, thereby violating the defendant's rights under the Sixth Amendment. *Id.* at 206, 12 L. Ed. 2d at 250.

In *United States v. Henry*, 447 U.S. 264, 65 L. Ed. 2d 115 (1980), the Court dealt with statements made by the defendant to his cellmate Nichols after the defendant had been indicted and while the defendant was in custody. The police had deliberately placed Nichols in the cell to get information from the defendant. To the defendant, Nichols was ostensibly nothing more than a cellmate. Nichols previously had been a paid informant, and in this case he was again paid for the information he obtained. *Id.* at 270, 65 L. Ed. 2d at 122. The Court concluded that Nichols was an agent of the State. *Id.* at 271, 65 L. Ed. 2d at 122. The Court noted that he was not merely a "passive listener" and in

fact had stimulated conversations with the defendant deliberately in order to elicit incriminating information against him. *Id.* at 271, 65 L. Ed. 2d at 121-22. The Court held that the defendant's statements to Nichols should be excluded because the manner in which they were obtained violated the defendant's constitutional rights under the Sixth Amendment. *Id.* at 274, 65 L. Ed. 2d at 125.

In the present case, there was no evidence that Potter was deliberately placed in the defendant's cell in order to elicit information. The State did not pay Potter for any information. During the first interview, Potter asked Moser to make a deal in exchange for the information the defendant had given him. Moser refused and stated that he had no authority to make any deals. The trial court also found that Moser advised Potter that he should have no further discussions with the defendant regarding the crimes and told Potter at all times that he was not working for any law enforcement agency. At the end of the second interview, Potter signed a written statement that he had been so advised.

A recent Supreme Court decision, *Kuhlmann v. Wilson*, 477 U.S. 436, 91 L. Ed. 2d 364 (1986), is controlling here. In that case, the defendant was convicted of common law murder and robbery of a dispatcher of a taxi company. *Id.* at 441, 91 L. Ed. 2d at 372. The police needed information on the identity of the defendant's confederates in the crime. *Id.* at 439, 91 L. Ed. 2d at 372. The defendant was purposely placed in a cell with Benny Lee who had, unbeknownst to the defendant, previously agreed to serve as an informant to the police. *Id.* at 439, 91 L. Ed. 2d at 371. The police told Lee not to ask questions but to simply "keep his ears open." *Id.* at 439, 91 L. Ed. 2d at 372. The defendant admitted to Lee that he committed the murder and robbery of the dispatcher. Lee informed the police of this admission of guilt.

The defendant, after his conviction, learned that Lee was a paid informant and filed a petition for habeas corpus. The Supreme Court ultimately reviewed the case and held that the defendant's statements to Lee were admissible. *Id.* at 456, 91 L. Ed. 2d at 382. The Court stated that the defendant "must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* at 459, 91 L. Ed. 2d at 384-85. The state trial court had found that Lee only listened to the defendant and did not ask any questions of him. The state trial court concluded, and

STATE v. TAYLOR

[332 N.C. 372 (1992)]

the Supreme Court of the United States agreed, that Lee did not deliberately elicit the defendant's incriminating statements. *Id.* at 460-61, 91 L. Ed. 2d at 385.

In the present case, all evidence tended to show that Potter was not an agent of the State. No evidence was presented that Potter was deliberately placed in the cell with the defendant in order to obtain information from him. Potter approached the police first. The police had made no previous agreement with Potter to obtain information, and Potter had received no payment or promise of payment for supplying information. The police told Potter that they could make no deals in exchange for information and that Potter was not an agent of the State. In addition, Potter's testimony during the hearing on the motion to suppress tended to show that the defendant voluntarily made all of the statements to Potter.

"Findings of fact concerning the admissibility of a confession are conclusive and binding if supported by competent evidence." *State v. Nations*, 319 N.C. 318, 325, 354 S.E.2d 510, 514 (1987). The evidence presented supported the trial court's findings of fact which in turn supported the trial court's conclusions of law, including its conclusion that Potter was not an agent of the state. No evidence supporting contrary findings or conclusions of law was presented. We therefore conclude that under the principles stated and applied in *Massiah, Henry,* and *Kuhlmann,* the trial court did not err in concluding that Potter was not an agent of the State and that the statements made by the defendant to his cellmate were not obtained in violation of the defendant's rights under the Sixth Amendment.

[2] The defendant also argues that his statements to Potter were obtained in violation of his rights under the Fifth Amendment of the Constitution of the United States. According to the defendant, the statement was obtained in violation of his rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 294 (1966). The defendant contends he could not voluntarily waive his rights because he did not know Potter was a police informant.

We reject the defendant's arguments. As previously stated, we conclude that Potter was not an agent of the State. Therefore, the protections of the Fifth Amendment are not implicated, because there was no action by a law enforcement officer or other individual acting on the State's behalf. *See Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, *reh'g denied*, 452 U.S. 973, 69 L. Ed. 2d

984 (1981); *State v. Nations*, 319 N.C. 329, 331, 354 S.E.2d 516, 518 (1987).

Furthermore, no interrogation of the defendant was involved. The trial court found and concluded that the defendant voluntarily spoke to Potter in their cell and that they "engaged in conversation during which time they discussed why they were incarcerated." In *Edwards*, the Supreme Court concluded that if the defendant initiated the conversation, then the defendant's rights under the Fifth Amendment were not implicated. 451 U.S. at 486, 68 L. Ed. 2d at 387. The defendant in the present case initiated the conversations with Potter; therefore, no interrogation occurred. The defendant's rights under the Fifth Amendment in the present case were neither implicated nor violated.

[3] The defendant also argues under this assignment of error that the State failed to produce the defendant's statements to Potter within the time frame required by N.C.G.S. § 15A-903. The defendant has not pointed out anything in the record in this case indicating when the District Attorney received or was made aware of the statements. The defendant also has failed to show that he brought this alleged violation of the discovery statute in question to the trial court's attention or sought sanctions because of the State's alleged violation.

A major purpose of the discovery procedures of Chapter 15A is "to protect the defendant from unfair surprise." *State v. Alston*, 307 N.C. 321, 330, 298 S.E.2d 631, 639 (1983). When the defendant does not inform the trial court of any potential unfair surprise, the defendant cannot properly contend that the trial court's failure to impose sanctions is an abuse of discretion. *Id.* at 331, 298 S.E.2d at 639. This assignment is overruled.

[4] The defendant argues in his next assignment of error that the trial court erred by denying his motion to suppress an inculpatory statement he made to another prisoner, Mark Pearce. The defendant argues that his statement to Pearce was obtained in violation of his rights under the Fifth and Sixth Amendments.

After hearing evidence, the trial court found and concluded that on 2 October 1989 the defendant admitted to Pearce that he committed the three murders. After the conversation with the defendant, Pearce asked to speak to an investigating officer. S.B.I. Agent Kenneth Moser was called to interview Pearce. Pearce

STATE v. TAYLOR

[332 N.C. 372 (1992)]

repeated the contents of the conversation to Moser. Moser advised Pearce that he had no authority to make any deals and that Pearce was not working for any law enforcement agency. The trial court, in an Order dated 13 August 1990, signed *nunc pro tunc* 18 September 1990, found that Pearce had no prior knowledge of the defendant's crimes and no prior contact with law enforcement officials. The trial court concluded that Pearce was not an agent of the State and that his testimony as to the defendant's statement to him did not violate the defendant's state or federal constitutional rights.

For reasons similar to those we have given in dealing with the defendant's statements to Potter, we conclude that the trial court did not err in denying the defendant's motion to suppress his statement to Pearce. This assignment is overruled.

The defendant next assigns as error the trial court's admission of the testimony of Ed Barnett regarding the statements made to him by Marion Meetze, one of the victims. The following examination occurred during trial:

Q. [Assistant District Attorney]: Did you have a conversation with Mr. Meetze before he left work on that Wednesday?

A. [Ed Barnett] Before I left, I did, yes.

Q. What time did you leave?

A. I normally left around 6:00 in the afternoon.

Q. And what conversation did you have with him before he left work, or before you left work, that day?

Mr. Ramos [Defendant's counsel]: Objection.

The Court: Overruled.

A. We, of course, normally talked about what was going on at work, and he had asked me to be off on Thursday and which I told him, fine.

Q. Did he give you an explanation of why he wanted to be off Thursday?

Mr. Ramos: Objection.

The Court: Overruled.

A. Yes, sir, he said that the Taylor guy was coming to pay him the money, and he and Ginger had found a boat for [$]600

or $650 they were going to buy on Thursday, and he wanted the day off because Ginger was supposed to go back to Greenville on Friday. Her mother was going to have some kind of minor surgery, so she was going to be gone, so he wanted the day off Thursday to go buy this boat.

[5]  The defendant argues that this testimony was inadmissible hearsay not within any exception and, furthermore, its admission was extremely prejudicial to him because it was the only evidence from a disinterested witness that placed the defendant at the scene at the time of the murders. We conclude that this testimony was hearsay, but that it was admissible under Rule 803(3) of the North Carolina Rules of Evidence. Rule 803 provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (3) Then Existing Mental, Emotional, or Physical Condition. — A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification or terms of declarant's will.

N.C.G.S. § 8C-1, Rule 803 (1988).

We conclude that the victim's statement to Barnett falls within the exception described in Rule of Evidence 803(3). When explaining the reasons for asking for time off, Marion Meetze told Ed Barnett that he planned to meet the defendant and then buy a boat. The victim stated his then-existing intent and plan to engage in a future act; he was going to meet the defendant for a particular reason. *See State v. McElrath*, 322 N.C. 1, 19, 366 S.E.2d 442, 452 (1988). We thus conclude that the trial court ruled correctly in overruling the defendant's objection to this testimony.

The defendant also argues under this assignment that the victim's statement was not close enough in time to the actual future event to be admissible under this exception to the hearsay rule. Rule 803(3) does not contain a requirement that the declarant's statement must be closely related in time to the future act intended. N.C.G.S. § 8C-1, Rule 803(3) (1988). A review of the cases interpreting Rule 803(3) does not reveal that any such requirement has been read into the statute by this Court. *See, e.g., State v.*

*Coffey*, 326 N.C. 268, 389 S.E.2d 48 (1990); *State v. McElrath*, 322 N.C. 1, 19, 366 S.E.2d 442, 452 (1988). We conclude that the statement by the victim Marion Meetze to Ed Barnett was sufficiently close in time to the occurrence of the intended future act—meeting the defendant—to be relevant under Rule 401 and that no more was required in this regard. N.C.G.S. § 8C-1, Rule 401 (1988). The defendant also contends that this testimony was "extremely prejudicial." Although it is not entirely clear, we assume he is arguing that the admission of Barnett's testimony was unfairly prejudicial under Rule 403. Exclusion of evidence under Rule 403 is within the sound discretion of the trial court. *State v. Mason*, 315 N.C. 724, 731, 340 S.E.2d 430, 434 (1986). The defendant has shown no abuse of discretion and we find none. This assignment of error is without merit.

**[6]** The defendant next assigns as error the trial court's exclusion of testimony of James Register, a coworker of Marion Meetze, regarding statements the victim Marion Meetze made to him. Register testified that in the summer of 1988 an unidentified black man met with Meetze at work. Meetze appeared to be upset after this meeting. Defense counsel asked Register what Marion Meetze said after the meetings. The trial court sustained the State's objections to these questions. The defendant proffered the substance of Register's testimony on *voir dire*. Register on *voir dire* testified that Meetze stated he and the stranger had discussed the sale of a gun shop in South Carolina.

The defendant without elaboration argues that this testimony was admissible under the *McElrath* standard. The defendant appears to argue that the statement falls within the Rule 803(3) exception to the hearsay rule and is also relevant to show that someone other than the defendant had a motive to kill Marion Meetze.

We conclude that the statement by Meetze to Register does not fall within the Rule 803(3) exception to the hearsay rule and that the trial court did not err by sustaining the State's objections to this testimony. The statement was clearly hearsay as it was offered to prove that someone other than the defendant purchased a gun shop in South Carolina from Meetze. The statement was not a statement of future intent of the declarant Meetze as required by Rule 803(3), but rather was a statement of his memory of a past act offered to prove the fact remembered. *See State v. McElrath*, 322 N.C. 1, 19, 366 S.E.2d 442, 452 (1988). Therefore, it was not

admissible. *Id.*; N.C.G.S. § 8C-1, Rule 803(3) (1988). This assignment is overruled.

The defendant next assigns as error the trial court's action in admitting into evidence a projectile removed from Michelle Arnold's body and testimony regarding the autopsies of the three victims. The defendant argues that the State failed to establish an adequate chain of custody, either for the projectile or for the bodies of the three victims. We conclude that the trial court did not err in admitting the projectile as real evidence or admitting testimony relating to the autopsies of the bodies.

[7]  The defendant argues that Detective Gary Shay who saw the three bodies at the scene of the murders and who was present during the autopsies never identified the bodies autopsied as the same ones recovered at the scene. The defendant also contends there was no evidence that the three bodies were in the same condition when autopsied as when they were found at the scene or that they were even the same bodies.

In resolving this issue, we apply the following legal principles:

This Court has stated that a two-pronged test must be satisfied before real evidence is properly received into evidence. The item offered must be identified as being the same object involved in the incident and it must be shown that the object has undergone no material change. *State v. Barfield,* 298 N.C. 306, 259 S.E.2d 510, *cert. denied,* 448 U.S. 907, 100 S.Ct. 3050, 65 L.Ed.2d 1137, *reh'g denied,* 448 U.S. 918, 101 S.Ct. 41, 65 L.Ed.2d 1181 (1980). The trial court possesses and must exercise sound discretion in determining the standard of certainty that is required to show that an object offered is the same as the object involved in the incident and is in an unchanged condition. *Id.* A detailed chain of custody need be established only when the evidence offered is not readily identifiable or is susceptible to alteration and there is reason to believe that it may have been altered. *See State v. Kistle,* 59 N.C. App. 724, 297 S.E.2d 626 (1982), *review denied,* 307 N.C. 471, 298 S.E.2d 694 (1983). Further, any weak links in a chain of custody relate only to the weight to be given evidence and not to its admissibility. *State v. Montgomery,* 291 N.C. 91, 229 S.E.2d 572 (1976). *See also State v. Grier,* 307 N.C. 628, 300 S.E.2d 351 (1983).

*State v. Campbell*, 311 N.C. 386, 388-89, 317 S.E.2d 391, 392 (1984). Applying these principles, we conclude that the State established an adequate chain of custody for the three bodies. Detective Gary Shay testified that he observed the three bodies at the scene. He photographed the bodies and was then present at the autopsy of each victim. Detective Shay identified the clothes on the bodies as the same as the ones on the bodies at the scene. The State clearly established a chain of custody for the bodies. Furthermore, any weak link in the chain of custody goes to the weight of the evidence, not its admissibility. *Id.*

[8]   The defendant contends that there was a break in the chain of custody of the projectile taken from Michelle Arnold's body. According to the defendant, S.B.I. Agent Diane Brown never testified that she received the projectile back from testing before she returned it to Detective Shay. Citing no authority, the defendant argues that the admission of the projectile as real evidence was error.

The State presented evidence that clearly identified the projectile tested as being the same .357 caliber projectile taken from Michelle Arnold's body and as being in the same condition as when retrieved. The medical examiner removed the projectile from Michelle Arnold's body during the autopsy. He described the projectile as a "distorted, large-caliber bullet." The medical examiner identified the projectile at trial as the one he removed from Michelle Arnold's body and noted the identification card he had signed that was attached. Because of the noticeable distortion of the projectile, witnesses who handled it were able to and did identify it on the basis of this unique characteristic. A review of the record and transcript reveals testimony of several witnesses which established a clear chain of custody of the projectile. Each person handling the projectile testified that he had custody of the bullet and it was not altered in any way. Again, we note that any weak link goes to the credibility of the evidence, not its admissibility. *Campbell*, 311 N.C. at 389, 317 S.E.2d at 392. The defendant's assignment of error is without merit.

[9]   The defendant next assigns as error the trial court's denial of his motion for separate juries during his trial and capital sentencing proceeding on the ground that, even though he received a life sentence, a "death qualified" jury is more likely to convict. As a result, he argues he was denied due process. The State first points out that there is no record of the trial court's disposition

of the defendant's motion. We are unable to review the trial court's action if the action is not reflected in the record on appeal. N.C. App. R. 9(b)(3); *State v. Williams*, 304 N.C. 394, 415, 284 S.E.2d 437, 451 (1981), *cert. denied*, 456 U.S. 932, 72 L. Ed. 2d 450 (1982). We have, in any event, frequently held that the "death qualification" of a jury does not violate the defendant's rights under the Constitution of the United States or the Constitution of North Carolina. *E.g., State v. Barts*, 316 N.C. 666, 678, 343 S.E.2d 828, 836 (1986) *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Oliver*, 309 N.C. 326, 337, 307 S.E.2d 304, 313 (1983). The defendant concedes that we have often rejected the argument that a "death qualified" jury is more likely to convict the defendant. *State v. Reese*, 319 N.C. 110, 119, 353 S.E.2d 352, 358 (1987); *State v. Rogers*, 316 N.C. 203, 214-15, 341 S.E.2d 713, 722 (1986); *State v. Cherry*, 298 N.C. 86, 104, 257 S.E.2d 551, 563 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980). We continue to adhere to our prior holdings. This assignment is without merit.

[10] The defendant next assigns as error the trial court's refusal to allow him to rehabilitate prospective jurors who stated that their personal or religious beliefs on the death penalty would impair their ability to serve as jurors in a capital trial. The Supreme Court of the United States has held that the proper standard for determining whether a juror is qualified is whether the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting from *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980) ). The manner and extent of inquiry on *voir dire* is within the trial court's discretion. *State v. Reese*, 319 N.C. 110, 120, 353 S.E.2d 352, 358 (1987). We have held:

> When challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged.

*State v. Oliver*, 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1981) (citations omitted), *quoted in Reese*, 319 N.C. at 120-121, 353 S.E.2d at 358.

STATE v. TAYLOR

[332 N.C. 372 (1992)]

We have carefully examined the answers given by those jurors the defendant claims might have been rehabilitated. The defendant made no showing that additional questioning would have resulted in different answers from those jurors and, thus, has failed to show an abuse of discretion by the trial court in denying his motion to rehabilitate the excused jurors.

[11] The defendant, citing no authority, next assigns as error the trial court's failure to state in the record its reasons for sentencing the defendant to three consecutive life sentences rather than concurrent sentences. The defendant argues that the Fair Sentencing Act, N.C.G.S. §§ 15A-1340.1 — 1340.7, requires the trial court to support its sentence with findings of fact related to aggravating and mitigating factors. The Fair Sentencing Act is inapplicable here. The defendant was sentenced under N.C.G.S. § 15A-2000 for convictions of three counts of first-degree murder, not under the Fair Sentencing Act.

The judgment of a court is presumed valid and just. *State v. Ahearn*, 307 N.C. 584, 597, 300 S.E.2d 689, 697 (1983) (*citing State v. Pope*, 257 N.C. 326, 335, 126 S.E.2d 126, 130 (1962)).

"A judgment will not be disturbed because of sentencing procedures unless there is a showing of abuse of discretion, procedural conduct prejudicial to the defendant, circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play."

*Id.* at 598, 300 S.E.2d at 697 (*quoting Pope*, 257 N.C. at 335, 126 S.E.2d at 130).

N.C.G.S. § 15A-1354 grants the trial court discretion to sentence a defendant convicted of multiple offenses to consecutive terms. N.C.G.S. § 15A-1354(a) provides:

Authority of the Court — When multiple sentences of imprisonment are imposed on a person who is already subject to an undischarged term of imprisonment, including a term of imprisonment in another jurisdiction, the sentences may run either concurrently or consecutively, as determined by the court. If not specified or not required by statute to run consecutively, sentences shall run concurrently.

N.C.G.S. § 15A-1354(a) (1988). The trial court had the discretion to impose consecutive sentences for multiple offenses. *See State*

*v. Johnson*, 320 N.C. 746, 753, 360 S.E.2d 676, 681 (1987). The defendant in the present case was convicted of three counts of first-degree murder. The jury recommended sentences of life imprisonment after finding and weighing the mitigating circumstances and aggravating circumstances. The defendant has not shown and we do not find an abuse of discretion by the trial court in sentencing the defendant to serve consecutive life sentences. This assignment of error is without merit.

The defendant received a fair trial free of prejudicial error.

No error.